UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X     **FOR PUBLICATION**

In re:                                                        :
                                                              :
WATERSCAPE RESORT LLC,                                         :     Chapter 11
                                                              :     Case No. 11-11593(SMB)
                                        Debtor.               :
---------------------------------------------------------------X

PAVARINI MCGOVERN, LLC,                                        :
                                                              :
                                        Plaintiff,            :     Adv. Proc. No. 11-02248
                                                              :
               -- against --                                  :
                                                              :
WATERSCAPE RESORT LLC, et al.,                                :
                                                              :
                                        Defendants.           :
---------------------------------------------------------------X

### MEMORANDUM DECISION GRANTING IN PART
### AND DENYING IN PART PLAINTIFF'S MOTION
### FOR PARTIAL SUMMARY JUDGMENT

**A P P E A R A N C E S :**

HOLLAND & KNIGHT LLP
Special Litigation Counsel for the Debtor
   and Debtor in Possession
31 West 52nd Street
New York, NY 10019

       Frederick R. Rohn, Esq.
       Henry A.H. Rosenzweig, Esq.

BARTON LLP
Attorneys for Pavarini McGovern
420 Lexington Avenue
New York, NY 10170

       Eric W. Sleeper, Esq.

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

The plaintiff Pavarini McGovern, LLC ("Pavarini") was retained as general contractor by the debtor and defendant Waterscape Resort LLC ("Waterscape") to construct a building (the "Project") in Manhattan.  Allegedly owed approximately $11 million, Pavarini commenced this class action adversary proceeding contending that Waterscape diverted certain trust fund monies owed to Pavarini and, ultimately, the subcontractors that worked on the Project.  (*See Complaint*, dated June 10, 2011 (ECF Doc. # 1).)[1]  Pavarini has moved for partial summary judgment on the first two counts of the *Complaint*.  For the reasons that follow**,** the motion is granted in part and denied in part.

## BACKGROUND

### A.    The Deal

#### 1.    The Loan Agreements

On or about June 11, 2007, U.S. Bank, National Association and USB Capital Resources, Inc. f/k/a USB Capital Funding Corp. (collectively "US Bank") made the following loan facilities available to Waterscape to refinance pre-existing debt and fund the construction of the Project, a 45-story hotel and condominium building located at 66-70 West 45th Street in Manhattan:

| Loan | Amount |
|------|--------|
| Construction Loan | $100,112,566 |
| Project Loan | $9,180,486 |

---

[1]    "ECF" refers to the docket in this adversary proceeding; "ECF/Main Case" refers to the docket in Case No. 11-11593.

| | |
|---|---:|
| Acquisition Loan[2] | $31,321,306 |
| USB Loan | $8,653,589 |

(*Affidavit of Gary D. Houston in Connection with Pavarini McGovern LLC's Motion for Summary Judgment*, sworn to Aug. 3, 2012 ("*Houston Affidavit*"), at ¶ 4 (ECF Doc. #60).)  The Acquisition and USB Loans were fully funded at the closing; the Construction and Project Loans were advanced as construction progressed.  (*Id.*)  The Construction Loan was to fund "a portion of the actual hard costs" (*see Amended and Restated Construction Loan Agreement*, dated June 11, 2007 ("*Construction Loan Agreement*"), at 1, ¶ C),[3] and the Project Loan was to fund "certain indirect construction costs . . . that do not qualify as cost of improvements under the Lien Law."  (*See Acquisition and Project Loan Agreement*, dated June 11, 2007 ("*Project Loan Agreement*"), at p. 1, second paragraph.)[4]  The Construction Loan was secured by a mortgage, and the Project Loan was secured by a Project Mortgage, Assignment of Rents and Security Agreement.  (*Houston Affidavit* at ¶ 6.)

### 2.    Funding the Project

Pursuant to the Construction Loan and Project Loan Agreements, US Bank agreed to make monthly advances to Waterscape to fund Project costs.  (*See Construction Loan Agreement*

---

[2]    As explained in the succeeding text, the Project and Acquisition Loans were contained in a single loan agreement.

[3]    A copy of the *Construction Loan Agreement* is annexed as Exhibit 1 to the *Houston Affidavit*.  A copy of the *Construction Loan Agreement* and a Lien Law § 22 affidavit were filed with the New York County Clerk on June 14, 2007.  (*Affidavit of William Frederick in Support of Pavarini McGovern LLC's Motion for Partial Summary Judgment*, sworn to June 25, 2012 ("*Frederick Affidavit*"), at ¶ 6 (*see* ECF Doc. # 35).)  The version of the *Frederick Affidavit* filed on the Court's Electronic Case Filing system is incomplete, unsigned and unsworn, but the copy delivered to chambers is verified and complete.

[4]    A copy of the *Project Loan Agreement* is annexed as Exhibit 2 to the *Houston Affidavit*.

at §§ 3.1 & 3.2*; Project Loan Agreement* at §§ 3.1 & 3.2.)  Waterscape requested advances by

submitting monthly Draw Requests to US Bank containing copies of, among other things,

invoices of the Project contractors and vendors.  (*Houston Affidavit* at ¶ 9.)  The Draw Requests

had to be accompanied by a Draw Request Certification that contained affirmative

representations by Waterscape to US Bank that, among other things, the funds being drawn

would be applied to fund the Project as specified in the requisition.  (*Id.* at ¶ 10.)  Once

approved, US Bank transferred the funds to Waterscape.

### 3.     The Construction Agreement

On June 28, 2007, Waterscape entered into a contract with Pavarini that designated

Pavarini as the Construction Manager for the Project.  (*See Construction Management

Agreement*, dated June 28, 2007 ("*CM Agreement*").)[5]  Pavarini entered into subcontracts with

various trade contractors and vendors to perform the necessary work.  (*Frederick Affidavit* at ¶

7.)  Pavarini was responsible for managing and hiring subcontractors, and was entitled to a fee of

2.75% of the entire cost of construction exclusive of the fee itself.   (*See CM Agreement* at Art.

9.5.1.)

Waterscape was not in privity with the subcontractors; it paid Pavarini and Pavarini was

responsible for paying the subcontractors.  Pavarini agreed to provide Waterscape with the

necessary paperwork to submit Draw Requests to US Bank for funds with which Waterscape

could make periodic payments to Pavarini as work was completed.  (*See id.* at Art. 12.)  Among

other things, Pavarini was required to submit monthly requests for payment (requisitions) to

Waterscape.  These monthly requests constituted an express representation by Pavarini, *inter*

---

[5]     The *CM Agreement* is annexed as Exhibit 2 to the *Frederick Affidavit*.

*alia*, that to the best of its knowledge, the payment requested was for work on the Project and
that the work performed thus far complied with the *CM Agreement*. (*See id.* at Art. 12.1.4.)
Within five business days after receipt of Pavarini's request for payment, Waterscape had to
issue a Certificate for Payment or notify Pavarini in writing why it was withholding the
Certificate. (*See id.* at Art.12.2.) If Waterscape issued a Certificate of Payment, it was required
to pay Pavarini within five but no later than thirty days of receipt of the Application of Payment,
in full, irrespective of whether it disputed the amounts due Pavarini. (*See id.* at Arts. 12.3.1 &
19.5.)[6] Any disputes were committed to a dispute resolution board ("DRB"). (*See id.* at Art.
19.5.)

## B.        The Dispute Between the Parties

The dispute between the parties centers on two sets of events. First, US Bank funded
certain requisitions but Waterscape failed to remit all of the funded proceeds to Pavarini.
Second, Waterscape sold condominium units and paid the proceeds to US Bank rather than
Pavarini in satisfaction of its loan obligations. In a nutshell, Pavarini alleges that the funded
requisitions and sales proceeds were trust funds under New York's Lien Law that Waterscape
illegally diverted.

---

[6]        Article 19.5 of the *CM Agreement* provided that:

   Costs for disputed Work shall be funded by [Waterscape] with the normal requisition
   process. Within 10 business days of the submission of a requisition [Waterscape] shall
   provide notice to [Pavarini] of any disputed portion of a requisition. [Waterscape] may
   submit the matter to the DRB for resolution. However, the subject payment will not be
   delayed and will be made 50% by the Owner as a Change Order and 50% from the
   Contingency pending resolution by the DRB . . . .

1.      **The Funded Requisitions**

Pavarini submitted forty-two correspondingly numbered requisitions to Waterscape. Waterscape submitted Draw Requests to US Bank for the first forty requisitions. US Bank funded all or part of the forty Draw Requests, but Waterscape did not turn over the entire funded portion to Pavarini. The shortfall, $4,458,616.97 (the "Shortfall"), represents what Pavarini has characterized as diverted trust funds. (*See Frederick Affidavit* at ¶ 15.) Pavarini also submitted a draft of Requisition no. 41 in the amount of $815,022, which US Bank did not fund and Waterscape did not pay. (*Id.* at ¶ 16.) On December 22, 2010, after Waterscape terminated the *CM Agreement*,[7] Pavarini sent Requisition no. 42 in the amount of $5,145,809, and the total amount owing under all of the unpaid requisitions aggregates $10,833,132.59.[8] (*Id.* at ¶ 17.)

Although Waterscape has not specifically accounted for the Shortfall, it has offered evidence that it used all monies received by US Bank per the Draw Requests to pay trust fund expenses. According to Waterscape, it received $85,157,163.64 in advances from US Bank pursuant to the Construction Loan. (*See Verified Statement Pursuant to Lien Law* sworn to Nov. 11, 2011 ("*Verified Statement*"), at 16 & Ex. E (p. 57 of 91).)[9] It paid out the aggregate sum of $85,226,259.57 for trust fund purposes, (*id.* at 17 & Ex. G (pp. 59-89 of 91)), or $69,095.93

---

[7]      On September 27, 2010, Waterscape sent Pavarini a letter terminating the *CM Agreement*. (*See Termination Letter*, dated Sept. 27, 2010.) A copy of the *Termination Letter* is annexed as Exhibit A to the *Affirmation of Solly Assa in Opposition to Motion for Partial Summary Judgment*, dated Aug. 3, 2012 ("*Assa Affirmation*") (ECF Doc. # 48).

[8]      On September 22, 2010, Pavarini filed a Notice of Mechanic's Lien in the sum of $12,179,601.59, an amount that reflected what was due the subcontractors and Pavarini. (*See Notice of Lien*, filed Sept. 22, 2010.) A copy of the *Notice of Lien* is annexed as Exhibit A to the *Declaration of Jason B. Bailey*, dated Aug. 2, 2012, which is attached to the *Cross Motion for Summary Judgment filed by Jason B. Bailey on behalf of Estate Hardwood Floors Corp. d/b/a Kultar Flooring*, dated Aug. 13, 2012 (ECF Doc. # 52). As noted below, Pavarini filed a proof of secured claim in this case limited to the unpaid amount of the requisitions—$10,833,132.59.

[9]      A copy of the *Verified Statement* is annexed to the *Frederick Affidavit* as Exhibit 20.

6

more than it drew from US Bank.  Pavarini concedes for the purpose of its motion that

Waterscape paid this amount and that the payments were for legitimate trust fund expenditures.

(*See Memorandum of Law in Support of Pavarini McGovern, LLC's Motion for Partial Summary

Judgment*, dated June 25, 2012 ("*Pavarini Memo*"), at 7 (*see* ECF Doc. # 35).)

### 2.     The Condominium Sales Proceeds

In addition to the funded Draw Requests, Waterscape received $14,510,340.00 from the

sale of certain condominium units.  (*See Verified Statement* at 17 & Ex. F (p. 58 of 91).)  As

noted earlier, it paid the net proceeds to US Bank at each closing to reduce US Bank's loans.  (*Id.*

at 16.)  Although the *Verified Statement* does not indicate how the proceeds were applied,

Waterscape's disclosure statement said that they were used to pay back the entire principal and

interest due on the Project Loan.  (*Debtor's Second Amended Disclosure Statement Pursuant to

§1125 of the Bankruptcy Code*, dated July 21, 2011 ("*Disclosure Statement*"), at 17 (ECF/Main

Case Doc. # 296).)  It appears that there was little if any repayment of the Construction Loan.

According to the *Disclosure Statement*, the balance as of March 1, 2011, was $94,871,542.  (*Id.*

at 18.)

### C.     This Bankruptcy

Waterscape commenced this chapter 11 case on April 5, 2011.  On June 9, 2011, Pavarini

filed a proof of secured claim in the amount of $10,833,132.59, plus interest, and commenced

this adversary proceeding the next day.  The *Complaint* includes seven counts, but the last four

were directed at US Bank and have been dismissed by stipulation.  (*See Stipulation and Order

Dismissing Claims Against U.S. Bank National Association and USB Capital Resources, Inc.

f/k/a USB Capital Funding Corp.*, dated Aug. 13, 2012 (ECF Doc. # 51).)

Three counts remain against Waterscape as well as other defendants, and Pavarini has moved for partial summary judgment on Counts I and II. In Count I, Pavarini seeks a declaration that the estate holds only bare legal title to any and all trust funds, including the Trust Assets,[10] and has no equitable interest in those funds until the claims of Pavarini and the subcontractors are fully satisfied. (*Complaint* at ¶ 63.) Consequently, Waterscape should hold those funds in trust until those claims are resolved. (*Id.* at ¶ 66.) In Count II, Pavarini alleges that Waterscape diverted trust funds and "should be compelled to identify all trust funds that were diverted and/or distributed by them, and all such trust funds should be recovered and returned to the benefit of Pavarini and the Trade Contractors, as the trust beneficiaries." (*Id.* at ¶ 80.)

Approximately one month after Pavarini commenced the adversary proceeding, Waterscape confirmed its *Second Amended Plan of Reorganization* ("*Plan*"). (*See Order Approving Disclosure Statement and Confirming Plan of Reorganization*, dated July 21, 2011 ("*Confirmation Order*") (ECF/Main Case Doc. # 128).)[11] The *Plan* represented the product of substantial negotiation and comment from Pavarini, US Bank and the Court, and resolved many of the issues raised in this adversary proceeding. The *Plan* contemplated the sale of the hotel portion of the Project free and clear of all liens, claims and interests. (*See Confirmation Order* at ¶ 18.) The mechanics lien claims were placed in Class 3. (*Plan* at § 4.3.) All but $14 million from the hotel sale proceeds would be paid to US Bank in partial satisfaction of its Class 1 claim. (*Id.* at § 4.1(b).) The balance would fund an $11 million Trust Fund Account for the benefit of

---

[10]    "Trust Assets" means "the proceeds generated from the Debtor's proposed sale of condominium units of the Project pursuant to this Court's Order entered on May 31, 2011, and the Debtor's proposed sale of the hotel portion of the Project, *i.e.*, the Hotel Assets, pursuant to the Debtor's pending Plan of Reorganization filed on May 6, 2011." (*Complaint* at ¶ 46.)

[11]    A copy of the *Plan* is annexed to the *Confirmation Order.*

the overlapping Class 3 Lien Law/trust fund claimants; the remaining $3 million would fund the

Class 5 Reserve Account for the benefit of the unsecured creditors in that class.  (*Id.* at §§ 4.1(b)

& 5.3.)

The $11 million contribution to the Trust Fund Account was not an arbitrary amount, and

reflected a settlement.  Waterscape's original plan essentially provided that all of the hotel sales

proceeds would be paid to US Bank in partial satisfaction of its secured claims.  (*See Debtor's*

*Plan of Reorganization*, dated May 6, 2011, at § 4.1 (ECF/Main Case Doc. # 43).)  Waterscape

also filed a plan modification that provided that the proceeds of any condominium sales would

be paid to US Bank until its claims were fully satisfied.  (*Modification to Debtor's Plan of*

*Reorganization*, dated May 20, 2011, at pp. 2-3 (ECF/Main Case Doc. # 68).)  Pavarini objected,

arguing that the trust beneficiaries held claims exceeding $10 million, the funds generated by the

hotel and condominium units were trust assets, and the trust claims had to be fully satisfied from

these proceeds before any monies could be distributed to US Bank.  (*See Objections of Pavarini*

*McGovern LLC to the Adequacy of the Debtor's Disclosure Statement and Confirmation of its*

*Plan of Reorganization*, dated June 17, 2011, at ¶¶ 19, 21-24 (ECF/Main Case Doc. # 93).)

The dispute was eventually resolved by US Bank's agreement to carve $11 million out of

the hotel sale proceeds to fund the Trust Fund Account.  This sum was selected because it

rounded up and therefore exceeded Pavarini's approximate $10.8 million claim.  All Class 3

claims would be deemed to be disputed, (*Plan* at § 4.3), and the Class 3 claimants would

continue to litigate their rights primarily in non-bankruptcy *fora*.  (*Id*. at § 5.6(c).)  Once a Class

3 Claim was finally resolved, the claim would be allowed and receive payment from the Trust

Fund Account.  (*Id.* at §4.3(c).)

The sale of condominium units, other than those covered in the *Verified Statement*, was first addressed shortly before confirmation. On May 31, 2011, the Court authorized Waterscape to consummate the pending sales of units 38A, 38B, 38C and 39B free and clear of liens, claims, interests and encumbrances, which would attach to the net proceeds thereof with the same force, effect and validity. (*Order Granting Authority to Debtor to (A) Assume and Consummate Pending Sale Agreements for Condominium Units; and (B) Make and Consummate New Sales of Condominium Units*, dated May 31, 2011 ("*Condo Sale Order*"), at ¶ B (ECF/Main Case Doc. # 82).) In addition, Waterscape was authorized to make future sales free and clear of liens, claims, interests and encumbrances at certain minimum prices without further order of the Court, with any liens, claims, interests and encumbrances similarly attaching to the net proceeds. (*Id.* at ¶ C.) The net proceeds would be held in a separate escrow account pending further order of the Court. (*Id.* at ¶ F.) Lastly, US Bank and the mechanics lienors were required to deliver releases of any liens of record at the closing. (*See id.* at ¶ E.)

Under the *Plan*, the *Condo Sale Order* continued to govern sales under contracts entered into prior to the Effective Date. The proceeds of post-Effective Date sale contracts, as well as any remaining sale proceeds from pre-Effective Date transactions, were to be distributed pursuant to a "waterfall." (*See Plan* at § 5.2(a).) Waterscape was required to deposit the first $2 million in the Class 5 Condominium Reserve Account, which would ultimately be transferred to the Class 5 Reserve Account for the benefit of the unsecured creditors. (*Id.* at § 5.2(a)(iv) & (v).) Once the Class 5 Condominium Reserve Account was fully funded, additional sale proceeds would be deposited into the Secured Claim Reserve Account for payment in order of priority, first to satisfy the balance of the US Bank claims that comprised Class 1 and Class 2, (*id.* at § 5.2(a)(vii)), and then to satisfy the Allowed Class 3 Claims. (*Id.* at §§ 5.2(a)(viii) & 5.3.) After

10

any disputed Class 3 Claims were resolved and Allowed Class 3 Claims were paid in full *or* all

mechanics liens were discharged, the Secured Claim Reserve Account would remain subject

only to the Chartis Lien as defined in the *Plan*.  (*Id.* at § 5.2(a)(ix).)

The sale of the hotel closed on January 20, 2012—the Effective Date of the *Plan*.  (*See
Debtor's Second Post-Confirmation Report and Notice of Effective Date of the Debtor's
Confirmed Second Amended Plan of Reorganization*, dated Jan. 20, 2012, at ¶ 3 (ECF/Main Case

Doc. # 306).)  Waterscape used the proceeds from the hotel sale and pre-Effective Date

condominium sales to pay US Bank $109 million in partial satisfaction of its claims, fund the

$11 million Trust Fund Reserve Account and fund the $3 million Class 5 Reserve Account.  (*Id.*

at ¶ 4.)

**D.    Pavarini's Motion**

On June 25, 2012, Pavarini moved for partial summary judgment on Counts I and II of

the *Complaint*.  As noted, the substance of Pavarini's claims is that Waterscape diverted trust

assets, including the Shortfall and the proceeds of the condominium sales that Waterscape

admittedly paid to US Bank outside of the *Plan*.  Waterscape concedes that the money it

requisitioned from US Bank and the net proceeds from the sale of the condominium units

constituted trust funds.  (*See Verified Statement* at 16-17 (scheduling the payments received from

US Bank and the condominium sales proceeds as trust funds).)  It argues, however, that it did not

divert these funds because it used them to pay other trust fund obligations.  Furthermore, even if

it diverted trust funds, it restored the diverted funds through the establishment of the $11 million

Trust Fund Account under the *Plan*.

Each side cites to provisions of the *CM Agreement* in support of their respective positions regarding, among other things, the timing of payments, the obligation to make payment notwithstanding a dispute and the right to set off.  However, the parties' contract claims have been committed for resolution to the DRB or other non-bankruptcy courts, and the Court offers no view on those issues.  The Complaint raises only Lien Law questions, and the parties have not contended that the Lien Law presents a set of default rules that can be modified by contract between an owner and general contractor.  Accordingly, the Court will limit the discussion to the Lien Law.

## DISCUSSION

### A.    Standards Governing Motion

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by FED. R. BANKR. P. 7056, governs summary judgment motions.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).[12]  The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.  *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  Where the non-moving party would have the burden of proof at trial, the movant may obtain summary judgment by showing that "little or no evidence may be found in support of the nonmoving party's case."  *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If the movant

---

[12]      Pavarini's motion is governed by the amendments to Rule 56 that became effective on December 1, 2010. Although some language has changed, the standard for granting summary judgment remains unchanged and the amendments will not "affect continuing development of the decisional law construing and applying these phrases." FED. R. CIV. P. 56 advisory committee's note (2010).

carries this initial burden, the nonmoving party must set forth specific facts that show triable

issues, and cannot rely on pleadings containing mere allegations or denials. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see Celotex Corp.*, 477 U.S. at

324. In deciding whether material factual issues exist, all ambiguities must be resolved and all

inferences must be drawn in favor of the nonmoving party. *Matsushita Elec.*, 475 U.S. at 587.

The parties must cite to the parts of the record that support or undercut the assertion that a

fact is not disputed. FED. R. CIV. P. 56(c). Under our local rules, the movant must submit a

"short and concise statement in numbered paragraphs" of the undisputed material facts, Bankr.

S.D.N.Y. R. ("LBR") 7056-1(b), and the opposing party must submit a statement controverting

those material facts that it contends are disputed. LBR 7056-1(c). In each instance, the movant

and opposing party must include a citation to admissible evidence that supports or controverts

the undisputed nature of material fact. LBR 7056-1(e). The latter requirement allows the Court

and the parties to focus on what is and is not in dispute, and provides a roadmap that permits the

Court to go directly to the cited evidence to determine whether it supports the statement.

Neither side complied with LBR 7056-1. Pavarini submitted a twenty page, seventy two

paragraph statement that contained no more than a handful of citations to any evidence submitted

with the motion. (*See Pavarini McGovern, LLC's Statement of Undisputed Facts in Support of

Its Motion for Partial Summary Judgment*, dated June 25, 2012 ("*Pavarini 7056 Statement*") (*see*

ECF Doc. # 35).) Waterscape's statement failed to cite any controverting evidence although it

contended that many of Pavarini's factual statements were disputed. (*See Waterscape Resort

LLC's Responses to Pavarini McGovern LLC's Statement of Undisputed Facts*, dated Aug. 3,

2012 (ECF Doc. # 50).) The failure to comply with LBR 7056-1(e) increased the burden on the

Court by requiring it to hunt through the substantial record created by the parties to determine

13

what was and was not in dispute.  In the end, the Court has disregarded the parties' statements, and the only undisputed facts are those identified in this opinion.

## B.    Disposition of the Motion

### 1.    Introduction

Under Article 3-A of the New York Lien Law, an owner holds in trust the funds received in connection with a contract for the improvement of real property, as well as any rights of action with respect to those funds.  N.Y. LIEN LAW § 70(1) (McKinney 2009).  The assets of the trust include, among other things, the funds received and the rights of action for payment under a building loan contract, N.Y. LIEN LAW § 70(5)(a), and "consideration for a conveyance recorded subsequent to the commencement of the improvement and before the expiration of four months after the completion thereof."  N.Y. LIEN LAW § 70(5)(d).  The trust comes into "existence from the time of the making of the contract . . . out of which the claim arises."  N.Y. LIEN LAW § 71(5).  It continues "with respect to every asset of the trust until every trust claim . . . has been paid or discharged, or until such assets have been applied for the purposes of the trust."  N.Y. LIEN LAW § 70(3).

Trust funds must be "held and applied for the payment of the cost of improvement." N.Y. LIEN LAW § 71(1).  If the trustee is the owner, trust claims include "claims of contractors, subcontractors, architects, engineers, surveyors, laborers and materialmen arising out of the improvement, for which the owner is obligated, and also means any obligation of the owner incurred in connection with the improvement for a payment or expenditure defined as cost of improvement."  N.Y. LIEN LAW § 71(3)(a); *accord* N.Y. LIEN LAW § 2(5) (defining "cost of improvement").  The trustee holds bare legal title to the trust funds, and an equitable interest vests in the balance of the trust funds only after all trust claims have been satisfied.  *RLI Ins. Co.*

14

*v. New York State Dep't of Labor,* 766 N.E.2d 934, 938 (N.Y. 2002); *City of New York v. Cross Bay Contracting Corp.*, 709 N.E.2d 459, 462 (N.Y. 1999); *Canron Corp. v. City of New York,* 674 N.E.2d 1117, 1122-23 (N.Y. 1996).

The use of trust funds for non-trust purposes constitutes a diversion, and if done voluntarily by the trustee, is also a breach of trust.  N.Y. LIEN LAW § 72(1); *see In re Elm Ridge Assocs.*, 234 F.3d 114, 125 (2d Cir. 2000); *Aspro Mech. Contracting, Inc. v. Fleet Bank, N.A.*, 805 N.E.2d 1037, 1039 (N.Y. 2004).  The failure to maintain the books and records required by the Lien Law regarding the trust creates a presumption that trust funds have been diverted, *see* N.Y. LIEN LAW § 75(4), but the presumption is only a "permissible inference" and does not shift the burden of proof.  *See Truax & Hovey, Ltd. v. Grosso* (*In re Grosso*), 9 B.R. 815, 826 (Bankr. N.D.N.Y. 1981) (quoting *People v. Rosano*, 409 N.E.2d 1357, 1358 (N.Y. 1980)).  Furthermore, the trustee is not required to segregate the trust assets, and "may treat the trust funds as running bookkeeping balances rather than as segregated accounts."  *Fentron Architectural Metals Corp. v. Solow*, 420 N.Y.S.2d 950, 952 (N.Y. Sup. Ct. 1979); *accord Caristo Constr. Corp. v. Diners Fin. Corp.*, 236 N.E.2d 461, 463 (N.Y. 1968); N.Y. LIEN LAW § 75(1) & (2).

### 2.    Count I

According to Pavarini's moving memorandum of law, Count I seeks a declaration that neither Waterscape nor its estate has a vested interest in the Missing Trust Funds aggregating $14,441,244.07.  (*Pavarini Memo* at 10.)  The Missing Trust Funds roughly correspond to the proceeds of the pre-petition condominium sales[13] identified in the *Verified Statement*,[14] (*see id.* at

---

[13]    One of the condominium sales generating proceeds of $1.8 million identified in the *Verified Statement* actually closed on October 27, 2011, after the entry of the *Condo Sale Order* and confirmation of the *Plan* but prior

7-8, 16), and that phrase will be used throughout the balance of this opinion to refer to those proceeds.

Initially, Waterscape argues that Count I has nothing to do with the Missing Trust Funds and instead, concerns only the Trust Assets, *i.e.*, the net proceeds from the condominium unit sales made pursuant to the *Condo Sale Order* and the net proceeds of the hotel sale contemplated under the proposed plan. The disposition of the Trust Assets is addressed by the *Condo Sale Order* and the *Plan*. The *Condo Sale Order* and the *Confirmation Order* are final and no longer subject to review. To the extent they declare rights different from the Lien Law, they govern.[15]

Although Waterscape is correct that Count I does not expressly refer to the earlier condominium unit sales identified in the *Verified Statement*, other allegations in the *Complaint* refer generally to the use of condominium sale proceeds to repay US Bank, (*Complaint* at ¶¶ 48 & 49), and these allegations are incorporated by reference into Count I. (*Id.* at ¶ 62). These allegations are sufficient to bring the question of the Missing Trust Funds within the relief sought through Count I. Furthermore, Waterscape concedes that these condominium sale proceeds as well as the proceeds received in connection with the Construction Loan Draws constituted trust funds under the Lien Law. As such, Waterscape held bare legal title, and Pavarini is entitled to partial summary judgment on Count I to that extent.

to the January 20, 2012 Effective Date. (*See Verified Statement*, Ex. F.) Neither side commented on this "discrepancy," and I assume the closing related to a contract that was entered into the before the *Condo Sale Order*.

[14]    The Missing Trust Funds reflect the difference between the proceeds of the condominium unit sales reported in the *Verified Statement* ($14,510,340.00) and the trust fund expenditures made by Waterscape in excess of the US Bank Draws ($69,095.93).

[15]    Pavarini concedes that it is not relevant at this stage to determine whether the proceeds of the sale of the hotel qualify as trust funds because of the $11 million escrow carved out of those proceeds under the *Plan*. (*Pavarini Memo* at 11.)

### 3.    Count II

Pavarini also seeks partial summary judgment on Count II directing Waterscape to turn

over all diverted trust funds to Pavarini for the benefit of itself and the subcontractors.  As noted,

the so-called diverted funds fall into two categories:  the Shortfall and the Missing Trust Funds.

In each case, the motion presents two questions.  First, has Pavarini demonstrated as a matter of

law that Waterscape diverted trust funds?  Second, if a diversion occurred, is Pavarini entitled to

a turnover order or other relief?

### a.    The Shortfall

Pavarini has failed to demonstrate as a matter of law that Waterscape diverted the

Shortfall.  Waterscape drew $85,157,163.64 in Construction Loan proceeds from US Bank, and

Pavarini concedes for the purpose of its motion that Waterscape paid $85,226,259.57 in trust

fund expenses, or $69,095.93 more than Waterscape received from US Bank.  The Lien Law

"expressly vests discretion in the trustee 'to determine the order and manner of payment of any

trust claims and to apply any trust asset to any purpose of the trust.'" *Aspro Mech. Contracting*,

805 N.E.2d at 1040 (quoting N.Y. LIEN LAW § 74(1)), and Waterscape had the discretion to use

the US Bank Draws to pay other trust fund expenses.  Thus, even if I credited Pavarini's

contention that it is entitled to a presumption of diversion, Waterscape rebutted the presumption

by offering evidence—which Pavarini does not dispute—that an amount greater than all of the

US Bank Draws was used to pay trust expenses.  *See Mike Bldg. & Contracting, Inc. v. Just

Homes, LLC*, 901 N.Y.S.2d 458, 478-79 (N.Y. Sup. Ct. 2010).

Pavarini primarily relies on the provisions of the *CM Agreement* to argue that Waterscape

was required to pay the Shortfall to Pavarini without offset and regardless of any disputes.

While the failure to pay the Shortfall to Pavarini arguably breached the *CM Agreement*, it did not

constitute a diversion or breach of trust.  Furthermore, any breach claims must be pursued before the DRB.

Accordingly, a material factual dispute exists regarding whether Waterscape diverted the Shortfall.

### b.    The Missing Trust Funds

#### i.    Diversion

According to the *Verified Statement*, "the net sale proceeds for each [condominium] unit after adjustments and closing costs were paid directly to [US Bank] at the closings to reduce the loan amounts."  (*Verified Statement* at 17.)  Initially, it is no excuse that Waterscape never had possession of the Missing Trust Funds, or that they were paid directly to US Bank at each closing in accordance with the parties' loan documentation.  (*See Assa Affirmation* at ¶ 34.)  A trustee cannot avoid a diversion claim by pledging trust funds to a transferee who is not a beneficiary of the trust under the Lien Law.  *See Caristo Constr. Corp.*, 236 N.E.2d at 463 (factor impermissibly received trust funds from its debtor-trustee in payment of outstanding credits); *Palm Beach Realty Co. v. Kangeiser, Inc.*, 233 N.Y.S.2d 641, 643 (N.Y. Sup. Ct. 1962) (use of trust funds to satisfy bank loan constituted diversion), *aff'd without op.*, 243 N.Y.S.2d 413 (N.Y. App. Div. 1963); *cf. In re Dunwell Heating & Air Conditioning Contractors Corp.*, 78 B.R. 667, 671 (Bankr. E.D.N.Y. 1987) ("[A] prior perfected secured creditor in accounts receivable is not entitled to its interest in that collateral until trust beneficiaries under Article 3–A of the N.Y. Lien Law have been satisfied in full from those assets traceable to the improvements to which they contributed as subcontractors.").

Although the *Verified Statement* did not disclose how the proceeds were allocated (which US Bank obligations were paid), the *Disclosure Statement* revealed that they were used primarily if not entirely to satisfy the Project Loan.  (*Disclosure Statement* at 17.)  The use of trust funds to pay the Project Loan was improper, and constituted a diversion for two reasons.  First, the payment of the Project Loan was not a "cost of improvement."  A "cost of improvement" includes:

> sums paid to take by assignment prior existing mortgages, which are consolidated with building loan mortgages and also the interest charges on such mortgages, sums paid to discharge or reduce the  indebtedness under mortgages and accrued interest thereon and other encumbrances upon real estate *existing prior to the time when the lien provided for in this chapter may attach* . . . .

N.Y. LIEN LAW § 2(5) (emphasis added).

According to Pavarini, the US Bank mortgages did not exist prior to the time Pavarini's rights attached.  Pavarini contends that its trust claim arose when the parties signed the *CM Agreement* on June 28, 2007 because that is the contract out of which its claim arises.  *See* N.Y. LIEN LAW § 71(5).  The Project Loan was not recorded until July 3, 2007.  Pavarini reasons that as a result, the payment of the Project Loan was not a "cost of improvement" within the meaning of the Lien Law.  (*See Pavarini Memo* at 17; *Reply Memorandum of Law in Further Support of Pavarini McGovern, LLC's Motion for Partial Summary Judgment*, dated Aug. 17, 2012, at 6-7 (ECF Doc. # 59).)

Pavarini's argument equates the term "lien" used in section 2(5)'s definition of "cost of improvement" with the "trust claim" referred to in section 71(5).  However, the two are not synonymous, and "an Article 3-A trust beneficiary does not have to have a lien or be a lienor." *Harman v. Fairview Assocs.*, 250 N.E.2d 209, 210 (N.Y. 1969); *accord Ingalls Iron Works Co.*

*v. Fehlhaber Corp.*, 337 F. Supp. 1085, 1091 (S.D.N.Y. 1972) ("Under New York law, a trust

beneficiary does not acquire the additional status of a mechanic's lienor.")  Nevertheless,

Waterscape has not contested Pavarini's position, and its failure suggests that it does not dispute

it.  *Rosenblatt v. City of New York*, No. 05 Civ. 5521(GEL), 2007 WL 2197835, at *7 (S.D.N.Y.

July 31, 2007) ("[p]laintiff effectively concedes defendants' other arguments . . . by her failure to

respond to them"); *Broad v. DKP Corp.*, No. 97 Civ. 2029(LAP), 1998 WL 516113, at *3

(S.D.N.Y. Aug. 19, 1998) (explaining that plaintiff's "silence" or failure to respond to

defendant's argument is a "tacit admission" thereof), *aff'd* 182 F.3d 898 (2d Cir. 1999).

Second, even if the repayment of the Project Loan was a "cost of improvement," the use

of trust funds was still a diversion because US Bank never filed a Notice of Lending.  Section

73(2) of the Lien Law states:

> In any action in which it is sought to charge a trustee personally
> with liability by reason of a diversion of trust assets, the trustee shall be
> entitled to show by way of defense that the transfer constituting the
> diversion was made to a transferee named in a "Notice of Lending" filed
> as provided in subdivision three and that the transfer was made as security
> for or in consideration of or in repayment of advances made to him as
> trustee or on his behalf as trustee in accordance with such notice of
> lending, and that such advances were actually applied for a purpose of the
> trust as stated in subdivision one or subdivision two of section seventy-one
> of this chapter.

N.Y. LIEN LAW § 73(2).  The purpose of the Notice of Lending is to inform trust fund

beneficiaries that trust funds may be used to repay a lender, and to that extent, will not be

available to pay other trust fund beneficiaries.  *See Aspro Mech. Contracting,* 805 N.E.2d at 1040

(filing a notice of lending promotes "the legislative intent to assure 'public notice of any

transaction of the owner, contractor or subcontractor that may lead to depletion of funds

available for future trust claims, even where the depletion merely repays advances that were in

fact used to pay trust claims accruing at an earlier [d]ate [citation omitted].'"); *Caristo Constr.*

*Corp.*, 236 N.E.2d at 466 ("The function of a notice of lending, according to the Law Revision

Commission, which drafted the legislation, is to inform prospective suppliers and subcontractors

that 'trust assets receivable by the trustee at a later stage of the improvement have been

anticipated for current expense [citation omitted].").  The repayment of such a "cost of

improvement" in the absence of a Notice of Lending or other notice to trust beneficiaries

precludes the trustee from asserting this defense to a claim of diversion.  *Spectrum Painting*

*Contractors, Inc. v. Kreisler Borg Florman Gen. Constr. Co.*, 864 N.Y.S.2d 61, 62-63 (N.Y.

App. Div. 2008).  Here, Pavarini contends that Waterscape never filed a Notice of Lending, and

Waterscape has not disputed this either.  Accordingly, this defense is not available to

Waterscape.

### ii.        Restoration

While Pavarini has demonstrated as a matter of law that Waterscape diverted the Missing

Trust Funds, Waterscape has established a defense of partial restoration.  A trustee or its assignee

may defend against a diversion claim by showing that the diverted funds have been restored, and

that the funds are available to pay trust claims.  *See Caristo Constr.*, 236 N.E.2d at 464 (if the

transferee of diverted funds had used its own funds "to pay trust claims and there had been no

loss to anyone, there would have been no ultimate diversion or loss for which the factor would be

liable") (*dicta*); *Fenton Architectural Metals*, 420 N.Y.S.2d at 953 ("If, in fact, there had been

any diversion by the payment of ground rents to the owner, he more than made up for it by

replacing those sums with other sums which more than restored the partially depleted trust.");

*Raisler Corp. v. Uris 55 Water St. Co.*, 397 N.Y.S.2d 668, 674 (N.Y. Sup. Ct. 1977) ("The court

holds that the defendants may prove the amounts diverted were restored in such manner that the

expectations of those who might look to the construction loan extended by the First National

21

City Bank as a source of credit information were in all respects met."); *Travelers Indem. Co. v. Cent. Trust Co.*, 263 N.Y.S.2d 261, 265-66 (N.Y. Sup. Ct. 1965) ("[I]t is proper to prove that diverted funds have been replaced and the trust purposes fulfilled [citation omitted] which amounts to a showing that a temporary diversion has been corrected.") (decided under the prior version of the Lien Law), *aff'd without op.,* 1967 WL 21985 (N.Y. App. Div. Feb. 16, 1967).

The restoration defense is based on the principle that the "law is not designed to impose a penalty upon a violator so as to create a windfall of double repayment for creditors." *Travelers Indem.,* 263 N.Y.S.2d at 266; *accord Raisler Corp.*, 397 N.Y.S.2d at 673.  Moreover, voluntary restoration serves the same purpose as an order directing one liable for diversion to post security to assure the proper distribution of trust assets, or furnish assurance in any other manner that trust funds will be available to pay trust claims.  N.Y. LIEN LAW § 77(3)(a)(v); *see Palm Beach Realty Co.,* 233 N.Y.S.2d at 641 (directing owner who diverted trust funds to post security to protect beneficiaries' interests pursuant to N.Y. LIEN LAW § 77(3)(a)(v)).  In either case, the spirit of the Lien Law is fulfilled and trust beneficiaries can rely on the restored fund for the payment of their claims.

The settlement that led to the funding of the $11 million Trust Fund Account was intended to restore the trust up to that amount.  That $11 million was carved out of the hotel sale proceeds to resolve Pavarini's objections to the use of hotel and condominium sale proceeds to satisfy the US Bank claims under the *Plan*.  The amount of the Trust Fund Account was based on the amount of Pavarini's claim, and reestablished the trust in a segregated account that cannot be disbursed without further Court order.  The terms of the *Plan* also allowed Waterscape to pay the proceeds from the condominium sales governed by the *Condo Sale Order* and future sales to US Bank.

Pavarini nevertheless contends that the restoration defense is not available unless "the [restored] funds thereby brought to the improvement are shown to have been used for the purposes of the trust." (*Pavarini Reply* at 11 (quoting *Raisler Corp.*, 397 N.Y.S.2d at 673).) Pavarini reasons that Waterscape cannot invoke the restoration defense because no part of the Trust Fund Account has yet been paid to any trust beneficiaries, but the language it quotes it misreads.  As the *Raisler* court explained in the next sentence:

> Relief in the nature of setting aside an unauthorized payment or other transfer should not be available to unpaid beneficiaries of a Lien Law trust when the assets contemplated when the work was undertaken have been fully realized, and *are available in the form of present cash to meet future trust claims as they mature*.  To hold otherwise would be to impose a double penalty without any explicit statutory authority therefor, such as that found in Section 73 pertaining to the retention of trust funds by a lender in repayment of funds previously advanced.

*Raisler Corp.*, 397 N.Y.S.2d at 673 (emphasis added).

Here, $11 million in Missing Trust Funds has been restored and is "available in the form of present cash to meet future trust claims as they mature."   If Waterscape must pay Pavarini another $11 million after escrowing $11 million from its sale proceeds for the same purpose, it will suffer a double penalty.  While the Court does not condone Waterscape's diversion, its punishment will be the costs of this litigation which, post-confirmation, will ultimately be borne by its members.  *See Travelers Indem.*, 263 N.Y.S.2d at 266 (If the defendant proves the restoration defense, "its punishment for the infraction will be the expense of this lawsuit and not liability to the plaintiff, which will have lost nothing by reason of the alleged improper financial dealings").

### iii.  The Balance of the Missing Funds

The Trust Fund Account did not fully restore the Missing Trust Funds.  The condominium sales reported in the *Verified Statement* exceeded $11 million, and Waterscape has failed to offer any evidence that the net difference—$3,441,244.07[16]—has been restored or otherwise secured.  The issue concerns the appropriate remedy.

Pavarini's demand that Waterscape turn over any Missing Trust Funds to Pavarini is premature.  The Lien Law provides security for the payment of contractor and subcontractor claims, but the right to payment depends on the law of contracts as well as the *Plan*.  Pavarini's Class 3 claim was deemed to be disputed, and the *Plan* left the resolution of those disputes to the DRB.  While the Missing Trust Funds are not implicated by the express provisions of the *Plan*, the intent was to require the trust beneficiaries to fix their claims in non-bankruptcy *fora* and then to seek payment pursuant to the terms of the *Plan*.

Furthermore, there are other remedies that may be more appropriate to the extent that any further remedy is necessary.  First, the Class 3 claimants can also look to the proceeds of future condominium sales to satisfy their claims.  Waterscape stated at oral argument that the US Bank debt had been refinanced, and the Class 3 mechanics lien claims now have the first right to payment from future sales of the condominium units.  (*Transcript of Hearing*, held Aug. 21, 2012, at 6 (ECF/Main Case Doc. # 390).)  Thus, there may be sufficient security or other assurances of payment that no further relief is necessary or warranted.[17]

---

[16]     This amount reflects a credit to Waterscape to the extent that its payment of trust fund expenses exceeded the US Bank Draws.

[17]     I agree that Waterscape cannot offset any amounts Pavarini allegedly owes Waterscape under the *CM Agreement* against claims by Pavarini that Waterscape diverted trust funds because mutuality is lacking.

24

Second, the Lien Law prescribes remedies for a diversion other than the immediate payment of diverted funds to trust beneficiaries.  As noted, the Court could order Waterscape to post additional security or furnish assurances to the extent "it appears that there is danger that such assets or asset will be dissipated before judgment or diverted from trust purposes."  N.Y. LIEN LAW § 77(3).  The Trust Fund Account cannot be disbursed absent further order of the Court and there is no danger of its dissipation.  Moreover, it appears that the subcontractor claims may be subsumed within the Pavarini claim, raising a substantial question whether any further assurances are necessary.

Accordingly, while Waterscape has established only a partial restoration defense, the appropriate remedy with respect to the balance of the Missing Trust Funds cannot be determined on the state of this record.  Pavarini has failed to establish as a matter of law that it is entitled to the turnover of any portion of the Missing Trust Funds at this time, and its motion for partial summary judgment is also denied to that extent.

The Court has considered the other issues raised by the parties, and to the extent not specifically addressed are found to lack merit.  The parties are directed to settle a proposed order

---

Waterscape would owe a debt in its capacity as trustee but would have a claim under a breached construction contract.  *See Ross-Viking Merch. Corp. v. A. Cyanamid Co. (In re Ross-Viking Merch. Corp.)*, 151 B.R. 71, 74 (Bankr. S.D.N.Y. 1993) ("The existence of a fiduciary duty or a trust relationship in one of the capacities of a party involved in an attempted setoff will not satisfy the concept of mutuality.").  It does not follow, however, and I do not decide whether either party can assert an offset against the other in the proceedings before the DRB.

25

consistent with this decision and contact chambers to schedule a conference at which to discuss

further proceedings in this matter.

Dated: New York, New York
       December 10, 2012


                            /s/ *Stuart M. Bernstein*
                            STUART M. BERNSTEIN
                            United States Bankruptcy Judge