UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

In re:                                                      :
                                                            :
WATERSCAPE RESORT LLC,                                      :        Case No. 11-11593 (SMB)
                                                            :        Chapter 11
                                    Debtor.                 :
---------------------------------------------------------------X
PAVARINI MCGOVERN, LLC,                                     :
                                                            :
                                    Plaintiff,              :
                                                            :        Adv. Proc. No. 11-02248 (SMB)
WATERSCAPE RESORT LLC, et al.                               :
                                                            :
                                    Defendants.             :
---------------------------------------------------------------X


## MEMORANDUM DECISION GRANTING PLAINTIFF'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT


**A P P E A R A N C E S:**

SILVERBERG P.C.
320 Carleton Avenue
Suite 6400
Central Islip, NY 11722

       Karl J. Silverberg, Esq.
         Of Counsel

      - and-

MEDINA LAW FIRM LLC
405 Lexington Avenue
Thirteenth Floor
New York, NY 10174

       Eric S. Medina, Esq.
         Of Counsel

*Attorneys for Defendant Waterscape Resort LLC*

RICHARD J. MIGLIACCIO, ESQ.
410 Park Avenue-Suite 1630
New York, NY 10022

*Attorney for Other Defendants*

BARTON LLP
420 Lexington Avenue
New York, NY 10170

  Eric W. Sleeper, Esq.
   Of Counsel

   - and -

JOHN E. OSBORN, P.C.
841 Broadway
Suite 500
New York, NY 10003

  Daniel H. Crow, Esq.
   Of Counsel

*Attorneys for Plaintiff Pavarini McGovern, LLC*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

  Plaintiff Pavarini McGovern, LLC ("Pavarini") moves for partial summary judgment to dismiss the counterclaim asserted by Waterscape Resort LLC ("Waterscape") and the "Other Defendants"[1] (collectively, the "Defendants"[2]) for purportedly misrepresenting that Pavarini had obtained subguard insurance to protect it from default by a certain subcontractor. Pavarini also moves for summary judgment striking[3] the Defendants' second, third, fourth, eleventh, and twelfth affirmative defenses. For the reasons stated, Pavarini's motion is granted.

---

[1] The "Other Defendants" include, Salim Assa a/k/a Solly Assa, Esak Assa, Elias Hanono, Jacobo Hanono, Salomon Masri, Simon Masri, Ezra Tawil, 45 Inmex Corp., Catmex 45, Corporation, and Gemstone 45 LLC.

[2] The Amended Complaint (defined below) included US Bank National Association and USB Capital Resources, Inc. f/k/a USB Capital Funding Corp. (collectively, "US Bank") as defendants (*see* Amended Complaint at ¶¶ 9-10) despite Pavarini previously stipulating to dismissal, with prejudice, of such parties. (*See Stipulation and Order Dismissing Claims Against U.S. Bank National Association and USB Capital Resources, Inc. f/k/a USB Capital Funding Corp.*, so ordered Aug. 13, 2012 (ECF Doc. # 51).) For purposes of this opinion, US Bank is not included in the term "Defendants."

[3] While a motion to strike an affirmative defense is typically made pursuant to Federal Civil Rule 12(f), *Sterling Die Casting Co., Inc. v. Local 365 UAW Welfare & Pension Fund* (*In re Sterling Die Casting Co., Inc.*), 118 B.R. 205, 206-07 (Bankr. E.D.N.Y. 1990) (Duberstein, C.J.) (citing *Bobbitt v. Victorian House, Inc.*, 532 F. Supp. 734, 736-37 (N.D. Ill. 1982)), a court may also strike an affirmative defense on a motion for summary

## BACKGROUND

The background and procedural history of this chapter 11 case and this adversary

proceeding are discussed at length in *Pavarini McGovern, LLC v. Waterscape Resort LLC* (*In re*

*Waterscape Resort LLC*), 483 B.R. 601 (Bankr. S.D.N.Y. 2012) ("*Waterscape I*"), *interlocutory*

*appeal denied*, No. 13 Misc. 47 (CM), 2013 WL 658152 (S.D.N.Y. Feb. 21, 2013); *In re*

*Waterscape Resort LLC*, No. 11-11593 (SMB), 2014 WL 1389762 (Bankr. S.D.N.Y. Apr. 9,

2014) ("*Waterscape II*"); and *Pavarini McGovern, LLC v. Waterscape Resort LLC* (*In re*

*Waterscape Resort LLC*), 520 B.R. 424 (Bankr. S.D.N.Y. 2014) ("*Waterscape III*"),

*interlocutory appeal denied*, Nos. 15 cv 356, 15 cv 460 (LTS) slip op. (S.D.N.Y. Feb. 26, 2015).

I assume familiarity with those decisions and discuss only the facts relevant to the instant

motion.

### A.    The *CM Agreement*

This adversary proceeding concerns the construction of a 45-story hotel and

condominium building located at 66-70 West 45th Street in Manhattan (the "Project").  On June

28, 2007, Waterscape and Pavarini entered into a Construction Management Agreement[4] ("*CM*

*Agreement*") under which Pavarini provided construction management services to Waterscape,

the Project's owner.  (*See Statement of Undisputed Facts Pursuant to Local Rule 7056-1(b) In*

*Support of Pavarini's Motion for Partial Summary Judgment*, dated Mar. 18, 2015 at ¶ 8

---

judgment where parties address the merits in briefing.  *Paretti v. Cavalier Label Co., Inc.*, 702 F. Supp. 81, 85
(S.D.N.Y. 1988).

[4]    Portions of the *CM Agreement* were attached as Ex. 1 to *Affidavit of William Frederick In Support of*
*Pavarini's Motion for Partial Summary Judgment*, dated Mar. 18, 2015 (ECF Doc. # 224-4) ("*Frederick Affidavit*"),
and the full *CM Agreement* was filed at ECF Doc. # 35-10.

("*Pavarini Facts*") (ECF Doc. # 224-2) and *Waterscape's Responsive Statement of Material Facts*, dated Apr. 21, 2015 at ¶ 8 ("*Waterscape Facts*") (ECF Doc. # 238).)

Among its provisions, the *CM Agreement* outlined the circumstances under which Pavarini would obtain subguard insurance. Subguard insurance is a two-party agreement between a construction contractor and an insurer, and similar to a payment and performance bond, provides loss protection in the event of a subcontractor's default. (*Frederick Affidavit* at ¶ 11.) The *CM Agreement* provided that Pavarini would obtain subguard insurance for certain of its trade contractors (*i.e.*, the subcontractors Pavarini hired to perform the various aspects of the work on the Project), as long as they qualified for coverage (*Pavarini Facts* at ¶ 15; *Waterscape Facts* at ¶ 15):

> Owner [Waterscape] and Construction Manager [Pavarini] have agreed that all required Trade Contractor and Vendor bonding may be accomplished through and under Construction Manager's Sub-Guard Insurance Program, at Owner's option. Upon Owner's election and subject to the last sentence of this Section, Construction Manager shall include each Trade Contractor or Vendor whose Trade Contract or Purchase Order amount is equal to or exceeds One Hundred Thousand Dollars ($100,000.00) in its Sub-Guard program, provided such Trade Contractors and Vendors qualify (as properly determined by Construction Manager). . . . To the extent that Owner directs Construction Manager to use a Trade Contractor or Vendor who is excluded from Sub-Guard and cannot provide the required Bonds, Construction Manager shall not be liable for any non-Construction Manager caused failure or performance by that Trade Contractor or Vendor or the resulting costs arising therefrom.

(*CM Agreement* at § 14.3.1.) In addition, the *CM Agreement* required Pavarini, "from time to time as required," to provide appropriate documentation to Waterscape confirming that its subguard program covered all subcontractors and vendors. (*Id.* at § 14.3.2.)

The *CM Agreement* also provided that a dispute resolution board ("DRB") would resolve disputes between the parties arising during the construction of the Project. (*See CM Agreement*, Art. 18.) The proceedings before the DRB are discussed in greater detail below.

4

## B.    Subguard Insurance

On September 26, 2007, Pavarini submitted payment application #4 to Waterscape in the aggregate amount of $1,858,228.  (*Frederick Affidavit*, Ex. 6 at "Requisition Summary" page.) The premium for subguard insurance constituted $690,899 of the total request, and when added to previously billed amounts, Pavarini had billed Waterscape a total of $782,437 for subguard insurance premiums.  (*Id*.)  Waterscape paid application #4 by check dated October 2, 2007. (*Id*., Ex. 7.)

On January 25, 2008 – subsequent to the payment of the subguard premiums – Pavarini executed a trade contract with a superstructure concrete subcontractor, 160 Broadway Concrete Corp. d/b/a Broadway Concrete ("Broadway Concrete").  (*Pavarini Facts* at ¶ 19; *Waterscape Facts* at ¶ 19; *Frederick Affidavit*, Ex. 8.)  Although the subcontract exceeded the contractual threshold, Pavarini did not obtain subguard insurance for Broadway Concrete and eventually returned the portion of the subguard premium that had been allocated to superstructure concrete – $199,296.94 – to Waterscape.  (*Pavarini Facts* at ¶ 20; *Waterscape Facts* at ¶ 20; *Frederick Affidavit*, Ex. 9 at "Requisition Summary" page.)  On September 11, 2009, Waterscape executed a written change order accepting the $199,297 credit.  (*Pavarini Facts* at ¶ 21; *Waterscape Facts* at ¶ 21; *Frederick Affidavit*, Ex. 10.)

## C.    State Court Action

Waterscape commenced a lawsuit in the Supreme Court of the State of New York, County of New York against Pavarini's principals, Eric McGovern and William Frederick (the "Principals"), asserting fraud in connection with their alleged misrepresentation to Waterscape that Pavarini had obtained subguard insurance for Broadway Concrete when it had not (the

5

"State Court Action").    The State Court Action is described in more detail in the later discussion

relating to *res judicata*.  For present purposes, it suffices to say that Justice Braun granted

summary judgment to the Principals and the Appellate Division affirmed.  *Waterscape Resort*

*LLC v. McGovern*, 967 N.Y.S.2d 368, 369 (N.Y. App. Div. 2013).

**D.       The DRB Action**

        In addition to the State Court Action, Waterscape filed a claim against Pavarini on May

29, 2012 with the DRB (the "DRB Action") alleging breach of the *CM Agreement* and fraud in

connection with its failure to obtain subguard insurance for Broadway Concrete.  (*See Frederick*

*Affidavit*, Ex. 5.)  In a thirty-four page decision, the DRB concluded that (i) Waterscape's

damages for breach of contract were capped at the contractual liquidated damages amount of

$450,000 (*id.* at 31), and (ii) "fraud could not have occurred at the time of billing as no

superstructure concrete contract was in existence. . . . [Pavarini's] reluctance to tell [Waterscape]

in 2009 that it had not included [Broadway Concrete] in Subguard does not bode well for

[Pavarini]; yet there is no evidence that [Pavarini] engaged in fraud, misrepresentation, bad faith

or gross negligence."  (*Id.* at 33.)

        The DRB further concluded that the existence or non-existence of subguard insurance

was immaterial to Waterscape's damages.  Pavarini had the contractual right to look to its

subguard insurer for indemnity, but Waterscape did not.  Instead, Waterscape's right to recover

damages was governed by the *CM Agreement* with Pavarini.  (*Id.* at 24-25.)

**E.       The Bankruptcy and This Adversary Proceeding**

        Waterscape commenced this chapter 11 case on April 5, 2011, and Pavarini commenced

this adversary proceeding two months later.  The original complaint*, inter alia*, charged the

6

Defendants with two types of diversions of trust funds under Article 3-A of the New York Lien

Law.  First, Pavarini contended that Waterscape failed to pay $4,458,616.97 (the "Shortfall")

from the requisitions funded by Waterscape's Project lender.  Second, Pavarini alleged that

Waterscape improperly repaid its Project lender approximately $14.5 million from the proceeds

of the sale of the Project's condominium units.  In *Waterscape I*, the Court denied Pavarini's

motion for summary judgment on the Shortfall diversion claim based on disputed issues of fact,

483 B.R. at 613, and granted summary judgment to Pavarini to the extent of concluding that

Waterscape had diverted the condominium proceeds.  *Id.*  The Court did not, however, require

Waterscape to restore the diverted condominium proceeds because it had funded an $11 million

trust under its confirmed plan which was thought sufficient to satisfy all unpaid trust fund claims.

The DRB subsequently issued a ninety-seven page Final Accounting in which it

concluded that Waterscape owed Pavarini $8,093,655.92.  *Waterscape II*, 2014 WL 1389762, at

*3.  Under the *CM Agreement*, Waterscape was required to satisfy this obligation before

mounting a judicial challenge, and Waterscape eventually paid Pavarini in full.  As a result,

Pavarini has been fully compensated by Waterscape for its claims under the *CM Agreement.*

## F.    The Amendments and Waterscape's *Counterclaim*

Despite the creation of the trust under the plan and the satisfaction of the Final Payment,

Pavarini continued to press its diversion claim.  After the completion of discovery, Pavarini

moved to amend its complaint to assert, *inter alia*, a punitive damages claim arising out of the

Defendants' diversion of trust funds, and the Court granted the motion.  *Waterscape III*, 520 B.R.

at 436.

7

Waterscape cross-moved to assert counterclaims based on Pavarini's alleged willful exaggeration of its mechanic's lien and for fraud in connection with its failure to procure subguard insurance for Broadway Concrete.  One of the Other Defendants, Salim Assa a/k/a Solly Assa ("Assa"), joined Waterscape's opposition and cross-motion, and adopted and incorporated its arguments.  (*See Notice of Joinder of Defendant Salim Assa a/k/a Solly Assa to Waterscape's: (I) Opposition to the Motion of Pavarini to Amend its Complaint to Assert Punitive Damages; and (II) Cross-Motion in Support of Motion to Amend Answer to Assert Counterclaim Against Pavarini for Willful Overstatement of Lien Pursuant to N.Y. Lien Law § 39*, dated Mar. 27, 2014, at 2 (ECF Doc. # 162).)

The Court denied Waterscape's cross-motion to the extent it sought to add a counterclaim based on willful lien exaggeration, *Waterscape III*, 520 B.R. at 437, but granted the cross-motion to the extent Waterscape sought to assert a fraud counterclaim relating to subguard insurance. *Id*. at 438-39.  Notably, the Court did not extend the same relief to Assa, who joined in the cross-motion, or to the remaining Other Defendants, who did not move for leave to assert a counterclaim or join in the cross-motion.  *See id*. at 427.

Following the disposition of the motion and cross-motion, Pavarini filed its amended complaint.  (*Amended Complaint and Jury Demand*, dated Dec. 19, 2014 ("*Amended Complaint*") (ECF Doc. # 199).)  Waterscape thereafter filed its *Answer to Complaint with Counter Claims*, dated Jan. 2, 2015 (ECF Doc. # 203).[5]  The subguard fraud counterclaim consisted of several related claims.  First, Waterscape alleged that Pavarini intentionally

---

[5]      Pages 1 through 15 of this document constituted Waterscape's answer to Pavarini's amended complaint and pages 15 through 21 constituted the counterclaim.  For convenience, I refer to the former as the "*Answer*" and the latter as the "*Counterclaim*."

misrepresented the existence of subguard coverage for Broadway Concrete when it billed and

Waterscape paid approximately $200,000 attributable to that coverage.  (*See Counterclaim* at ¶¶

4, 7-8, 14, 18-20, 23, 25, 34-35.)  I refer to this as the "Fraudulent Billing Claim."  Second,

Pavarini thereafter concealed for approximately two years that its subguard insurance did not

cover Broadway Concrete.  (*Id.* at ¶¶ 13, 17, 22, 24.)  I refer to this as the "Fraudulent

Concealment Claim."  Third, Waterscape also alleged that Pavarini refused to place Broadway

Concrete in default due to its lack of subguard insurance resulting in construction delays, faulty

work, and other damages.  (*Id.* at ¶¶ 9-11, 26.)  I refer to this as the "Delay Damage Claim."

Finally, the *Counterclaim* alleged that Pavarini failed to disclose the terms of or obtain

Waterscape's approval for the Broadway Concrete subcontract, (*id.* at ¶¶ 12, 16), and

misrepresented in payment applications that the amounts relating to subcontractor work were

justly due.  (*Id.* at ¶¶ 27-30.)  These allegations do not relate to subguard insurance, and the

Court did not grant Waterscape leave to assert them.

Although leave to amend had been granted only to Waterscape, the Other Defendants

filed a substantially identical answer that included a fraud counterclaim against Pavarini for

failure to procure subguard insurance.  (*See Answer to Amended Complaint with Counter Claim*,

dated Jan. 2, 2015 ("*Other Defendants' Answer*") (ECF Doc. # 202).)

## G.    Pavarini's Motion for Summary Judgment

Pavarini moved for partial summary judgment with respect to Defendants' fraud

counterclaims and certain of their affirmative defenses.  (*See Motion of Pavarini for Partial

Summary Judgment*, dated Mar. 19, 2015 (ECF Doc. # 224).)[6]  It argued that Waterscape's fraud

---

[6]      Pavarini's motion was supported by the *Memorandum of Law in Support of Pavarini's Motion for Partial
Summary Judgment*, dated Mar. 18, 2015 ("*Pavarini Memo*") (ECF Doc. # 224-1); *Declaration of Eric W. Sleeper*,

counterclaim was time-barred, precluded under the doctrine of *res judicata* and lacked recoverable out-of-pocket damages since Pavarini had returned the $200,000 allocated to the premium for insuring Broadway Concrete. (*Pavarini Memo* at 14-22, 25-27.) Pavarini also argued that the Other Defendants' identical counterclaim should be stricken because the Court did not grant them leave to assert a counterclaim. (*Id.* at 2.) Finally, Pavarini argued that Defendants' second, third, fourth, eleventh and twelfth affirmative defenses were barred by prior decisions of this Court or the DRB. (*Id.* at 22-25, 27-29.)

Waterscape opposed Pavarini's motion, and the Other Defendants joined Waterscape's objection.[7] (*See Memorandum of Law in Opposition to the Motion of Pavarini for Partial Summary Judgment Dismissing: (I) Waterscape's Counterclaims; and (ii) Waterscape's Second, Third, Fourth, Eleventh, and Twelfth Affirmative Defenses*, dated Apr. 21, 2015 ("*Waterscape Memo*") (ECF Doc. # 240).)[8] Waterscape argued that the *Counterclaim* was timely filed under New York law, the *Counterclaim* and affirmative defenses survived the DRB resolutions, which Waterscape contended were not binding, the State Court Action was litigated without discovery, Waterscape's fraud claim existed independent of Pavarini's contractual breach, and Waterscape was entitled to setoff and recoupment defenses. (*Waterscape Memo* at 3-18.)

---

*Esq. in Support of Pavarini's Motion for Partial Summary Judgment*, dated Mar. 18, 2015 (ECF Doc. # 224-3); and *Frederick Affidavit*.

[7]    *See Notice of Joinder of Other Defendants to Waterscape's Opposition to the Motion of Pavarini for Partial Summary Judgment to Dismiss Counterclaims and Affirmative Defenses*, dated Apr. 21, 2015 (ECF Doc. # 239).

[8]    Waterscape's opposition was supported by *Solly Assa's Affidavit in Opposition*, dated Apr. 21, 2015 (ECF Doc. # 235); *Richard Migliaccio's Declaration in Opposition*, dated Apr. 21, 2015 (ECF Doc. # 236); and *Karl Silverberg's Declaration in Opposition*, dated Apr. 21, 2015 (ECF Doc. # 237).

Pavarini filed a reply on April 28, 2015,[9] and the Court heard oral argument on May 7, 2015.[10]

## DISCUSSION

### A.    Standards Governing the Motions

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by FED. R. BANKR. P. 7056, governs summary judgment motions. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). Where the non-moving party would have the burden of proof at trial, the movant may obtain summary judgment by showing that "little or no evidence may be found in support of the nonmoving party's case." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see Celotex Corp.*, 477 U.S. at 324. In deciding whether material factual issues exist, all ambiguities must be

---

[9]    *See Reply Memorandum of Law in Further Support of Pavarini's Motion for Partial Summary Judgment*, dated Apr. 28, 2015 (ECF Doc. # 241).

[10]    Transcript of May 7, 2015 hearing available at ECF Doc. # 244.

resolved and all inferences must be drawn in favor of the nonmoving party. *Matsushita Elec.*,

475 U.S. at 587 (citation omitted).

**B.      Statute of Limitations**

Under New York law, a fraud claim must be commenced within "the greater of six years

from the date the cause of action accrued or two years from the time the plaintiff or the person

under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have

discovered it." N.Y. C.P.L.R. § 213(8) (McKinney 2015).   Pavarini contends (*Pavarini Memo*

at 15-16) that the alleged fraud claim accrued on September 26, 2007 when, according to

Waterscape, "Pavarini falsely represented to Waterscape . . . that [Pavarini] had incurred

approximately $200,000 in premium cost for including the Broadway Trade Contract in

[Pavarini's] Subguard Insurance program."  (*Counterclaim* at ¶ 18.)  Here, the *Counterclaim*

would have become time-barred six years later on September 26, 2013, but was first asserted

when Waterscape cross-moved to amend on March 27, 2014.  *See Moore v. State of Indiana*, 999

F.2d 1125, 1131 (7th Cir. 1993) ("As a party has no control over when a court renders its

decision regarding the proposed amended complaint, the submission of a motion for leave to

amend, properly accompanied by the proposed amended complaint that provides notice of the

substance of those amendments, tolls the statute of limitations, even though technically the

amended complaint will not be filed until the court rules on the motion.") (citations omitted).

Pavarini's statute of limitations defense lacks merit because the *Counterclaim* relates

back to the Defendants' original answer filed on September 15, 2011 (the "*Original Answer*").

(ECF Doc. # 13.)  Federal Civil Rule 15(c)(1)(B), made applicable to this adversary proceeding

by Rule 7015 of the Federal Rules of Bankruptcy Procedure, provides that "[a]n amendment to a

pleading relates back to the date of the original pleading when: the amendment asserts a claim or

defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set

out—in the original pleading. . . ." FED. R. CIV. P. 15(c)(1)(B).  For an amendment to assert a

claim relating back to "conduct, transaction, or occurrence" set out in the original pleading, there

must be "a common 'core of operative facts' uniting the original and newly asserted claims."

*Mayle v. Felix*, 545 U.S. 644, 659 (2005) (Ginsburg, J.), *reargument denied*, 545 U.S. 1158

(2005); *accord Slayton v. Am. Express Co.*, 460 F.3d 215, 228 (2d Cir. 2006).  The "central

inquiry" under Federal Civil Rule 15(c) "is whether adequate notice of the matters raised in the

amended pleading has been given to the opposing party within the statute of limitations by the

general fact situation alleged in the original pleading."  *Stevelman v. Alias Research Inc.*, 174

F.3d 79, 86-87 (2d Cir. 1999) (citation and internal quotation marks omitted).  The same

standard applies when determining whether a counterclaim relates back to allegations in a

defendant's answer.  *See, e.g.*, *Spanierman Gallery v. Merrit*, 00 Civ. 5712 (THK), 2004 WL

1781006, at *6 (S.D.N.Y. Aug. 10, 2004) (defendant's replevin counterclaim related back to her

original answer which included assertions that the defendant was entitled to legal and actual title

of painting).

The *Original Answer* detailed the facts surrounding the Fraudulent Billing Claim,

Fraudulent Concealment Claim and the Delay Damages Claim.  The third affirmative defense

alleged that Pavarini wrongfully charged and received approximately $200,000 to cover

subguard insurance premiums allocable to Broadway Concrete, (*Original Answer* at ¶ 114),

Pavarini failed to disclose the lack of subguard insurance for a period of two years, (*id*. at ¶ 117),

but failed to obtain subguard coverage (*id*. at ¶ 114), and delayed placing Broadway Concrete in

default because Broadway Concrete was not covered by subguard insurance.  (*Id.* at ¶ 116.)  The

13

*Counterclaim* arises from the same "common core of operative facts" as the third affirmative

defense in the *Original Answer*. Thus, Pavarini had adequate notice of Waterscape's

contentions, and the *Counterclaim* relates back to September 15, 2011 – the date of Waterscape's

*Original Answer*. Hence, the fraud *Counterclaim* is not barred by the six-year statute of

limitations.[11]

**C.    *Res Judicata***

Pavarini next argues that the *Counterclaim* is barred under principles of *res judicata* or

claim preclusion citing the holdings of the courts in the State Court Action and the DRB Action.

**1.    State Court Action**

Pavarini contends that Waterscape's fraud claim is precluded based on the state court

judgment in favor of the Principals. The preclusive effect of a state court judgment in a

subsequent federal lawsuit is determined by reference to the preclusion law of the state in which

judgment was rendered. *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380

(1985). Under New York law, "an existing final judgment rendered upon the merits by a court

of competent jurisdiction, is binding upon the parties and their privies in all other actions or suits

on points and matters litigated and adjudicated in the first suit or which might have been litigated

therein." *Israel v. Wood Dolson Co.*, 134 N.E.2d 97, 98 (N.Y. 1956) (citations omitted); *accord*

*Josey v. Goord*, 880 N.E.2d 18, 20 (N.Y. 2007). Under "New York's transactional analysis

approach to res judicata, once a claim is brought to a final conclusion, all other claims arising out

of the same transaction or series of transactions are barred, even if based upon different theories

---

[11]    The Other Defendants filed their substantially identical answer on the same day. (*See* ECF Doc. # 14.)
The relation back analysis is, therefore, same.

or if seeking a different remedy." *In re Hunter*, 827 N.E.2d 269, 274 (N.Y. 2005) (citation and internal quotation marks omitted).  Moreover, a non-party to the original action may rely on *res judicata* to defeat the plaintiff's claim in the second action if "the liability of the defendant is altogether dependent upon the culpability of one exonerated in a prior suit, upon the same facts, when sued by the same plaintiff." *Good Health Dairy Prods. Corp. of Rochester v. Emery*, 9 N.E.2d 758, 759 (N.Y. 1937); *accord Edward Joy Co. v. Hudacs*, 606 N.Y.S.2d 74, 76 (N.Y. App. Div. 1993) ("A person is not a party to a prior action, but only derivatively or vicariously liable for the conduct of another, may invoke the *res judicata* effect of a prior judgment on the merits in that action in favor of the one primarily liable.") (citations and internal quotations marks omitted).

Marinelli Assocs. v. Helmsley-Noyes Co., Inc., 705 N.Y.S.2d 571 (N.Y. App. Div. 2000), on which Pavarini relies, illustrates how *res judicata* precludes a second action against a non-party to the first action in a situation similar to the present one.  There, the plaintiff ("Marinelli") and Jack Vickers and Donald Weill entered into a joint venture agreement to own and operate certain real property.  The joint venture agreement also contained an arbitration clause.  The joint venture thereafter entered into a management agreement with Helmsley Noyes Company, Inc. ("Helmsley"), and Helmsley, in turn, employed Vickers and Weill as senior vice presidents in charge of the day-to-day management of the property.  *Id.* at 573.

Marinelli eventually commenced an arbitration proceeding against Vickers and Weill seeking an accounting, and subsequently amended its arbitration demand to include money damage claims based on fraud, breach of fiduciary duty and conversion.  The new claims charged that Vickers and Weill systematically paid invoices for repairs that were deliberately

15

inflated or never performed. *Id.* In response, Vickers and Weill sought a stay of arbitration in New York Supreme Court contending that the claims were time-barred. The Supreme Court granted the motion with respect to all counts except for the claim seeking an accounting. *Id.*

Marinelli thereafter commenced a separate action in New York Supreme Court against Helmsley seeking money damages based on the actions of Vickers and Weill as Helmsley's employees in making payments for overcharges and phantom repairs. *Id.* Helmsley moved to dismiss on the ground of *res judicata*. *Id.* at 574. Marinelli responded, *inter alia*, that claims against Helmsley could not be barred since it was not party to the initial arbitration proceeding against Vickers and Weill. *Id.*

The Supreme Court granted the motion to dismiss and the Appellate Division affirmed. The Appellate Division began by reiterating the settled principle of *res judicata*, or claim preclusion, under New York law:

> It is well settled that under the transactional approach adopted by New York in res judicata jurisprudence, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy" (*O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 429 N.E.2d 1158, *citing Matter of Reilly v. Reid,* 45 N.Y.2d 24, 29–30, 407 N.Y.S.2d 645, 379 N.E.2d 172). Pursuant to this approach, the doctrine bars not only claims that were actually litigated but also claims that could have been litigated, if they arose from the same transaction or series of transactions.

*Id.*

Furthermore, under certain circumstances, a non-party to the first proceeding may invoke *res judicata* in a second proceeding:

> It is well settled that a defendant who was not a party to a prior proceeding may nevertheless assert res judicata "where [its] liability ... is altogether dependent upon the culpability of one exonerated in a prior suit" (*Good Health Dairy Prods. Corp. v. Emery,* 275 N.Y. 14, 17, 9 N.E.2d 758 citation omitted; *Edward Joy Co.*

16

*v. Hudacs,* 199 A.D.2d 858, 606 N.Y.S.2d 74 "'[a] person not a party to a prior action, but only derivatively or vicariously liable for the conduct of another, may invoke the *res judicata* effect of a prior judgment on the merits in that action in favor of the one primarily liable'", *quoting New Paltz Cent. School Dist. v. Reliance Ins. Co.,* 97 A.D.2d 566, 567, 467 N.Y.S.2d 937).

*Id.* at 576.

The Appellate Division concluded that *res judicata* barred Marinelli's claims against Helmsley. They involved "the very same claims that were raised in the arbitration against Vickers and Weill," and the mere fact that Helmsley's liability was vicarious based on their actions did not obviate the effects of the bar. *Id.*

The same principles preclude the assertion of Waterscape's Fraudulent Billing Claim and Fraudulent Concealment Claim. In the State Court Action, Waterscape asserted that: (1) Pavarini and the Principals billed Waterscape for subguard premiums for two years when they had never obtained coverage for Broadway Concrete (*i.e*, the Fraudulent Billing Claim) and (2) Pavarini and the Principals misrepresented and/or failed to disclose that subguard insurance did not exist for Broadway Concrete both before and after it defaulted (*i.e*, the Fraudulent Concealment Claim). (*See Bench Decision of Justice Richard F. Braun*, dated Apr. 24, 2012, at 3-4.)[12] Waterscape contended that it suffered damages from the loss of the premium money and as a result of the Principals' and Pavarini's failure to obtain subguard insurance coverage for Broadway Concrete. (*Id.* at 4.)

Justice Braun granted the Principals' motion for summary judgment on the Fraudulent Concealment Claim. Under New York law, the elements of a fraudulent concealment claim

---

[12]        A copy of Justice Braun's Bench Decision is annexed to the *Frederick Affidavit* as Ex. 11.

include "(1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to

make such disclosures; (3) nondisclosure; (4) scienter; (5) reliance; and (6) damage."

*Mushahada Int'l USA, Inc. v. Access Point, Inc.*, No. 04 cv 5270 (ARR), 2005 WL 1421620, at

*4 (E.D.N.Y. June 17, 2005) (citing *Cong. Fin. Corp. v. John Morrell & Co.*, 790 F. Supp. 459,

472 (S.D.N.Y. 1992)).  "A duty to speak cannot arise simply because two parties may have been

on opposite sides of a bargaining table", *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d

Cir. 1993), but will arise in three circumstances:

> [F]irst, where the party has made a partial or ambiguous statement,
> on the theory that once a party has undertaken to mention a
> relevant fact to the other party it cannot give only half of the truth;
> second, when the parties stand in a fiduciary or confidential
> relationship with each other; and third where one party possesses
> superior knowledge, not readily available to the other, and knows
> that the other is acting on the basis of mistaken knowledge.

*Id*. (internal quotation marks and citations omitted).

Initially, Judge Braun rejected the application of the fiduciary or "special relationship"

doctrine.  Nevertheless, Waterscape also contended that the Principals had the same duty to

disclose the absence of subguard insurance under the "special facts" or "superior knowledge"

doctrine, the third circumstance identified by the *Brass* Court.  Although the doctrine may give

rise to a duty to disclose when one party has superior knowledge of essential facts that renders a

transaction inherently unfair without disclosure of those facts, the material fact must be

peculiarly within the knowledge of the defendant and the information is such that it could not

have been discovered by the plaintiff in the exercise of ordinary intelligence.[13]  (*Bench Decision*

---

[13]    Justice Braun noted that Pavarini rather than the Principals had a contractual duty to Waterscape, (*Bench Decision* at 6), but did not suggest that Pavarini had a duty to Waterscape *vis-a-vis* subguard insurance independent of its contractual duty.  Moreover, on appeal, the Appellate Division stated that "a special relationship of trust and confidence does not arise merely from an arm's-length business transaction."  *McGovern*, 967 N.Y.S.2d at 368.

at 6-7.)  Justice Braun ruled that Waterscape could have checked with either Broadway Concrete or the subguard insurance company regarding the existence of subguard insurance.  (*Id.* at 7.)

Justice Braun also concluded that the Principals were entitled to summary judgment on the Fraudulent Billing Claim.  The application for payment submitted to Waterscape did not and could not contain a misrepresentation that Pavarini had purchased insurance for Broadway Concrete because Broadway Concrete was not even a subcontractor at that time.  (*Id.* at 7-8.)

The Appellate Division affirmed.  First, Waterscape had failed to show reasonable or justifiable reliance to support its Fraudulent Concealment Claim.  It "neither inquired of the subcontractor nor of the subguard provider if the subcontractor was covered, despite the fact that the agreement between plaintiff and Pavarini specifically contemplated the possibility of a trade contractor not being qualified for subguard coverage."  *McGovern*, 967 N.Y.S.2d at 369.  Second, Waterscape had also failed to show *scienter* (*i.e.*, a knowing misrepresentation) necessary to sustain its Fraudulent Billing Claim.  The subcontract between Pavarini and Broadway Concrete had not been executed when Pavarini requisitioned payment for the subguard premium from Waterscape, and hence, Pavarini could not have made a knowing misrepresentation that its subguard insurance did not cover Broadway Concrete.  *Id.* at 369-70.

Waterscape has asserted the same subguard claims in this adversary proceeding that it asserted or could have asserted in the State Court Action.  ((*Original Answer* at ¶ 114) "Pavarini's misuse of trust funds and its deception of Waterscape is currently the subject matter of a fraud action commenced by Waterscape against Pavarini entitled *Waterscape Resort LLC v. Eric McGovern and William Frederick* (Sup.Ct. NY, Index No. 652123/2010.".)  The state courts rejected the same Fraudulent Concealment Claim because even if Pavarini had a duty to

speak, Waterscape failed to show justifiable or reasonable reliance; Waterscape could have

checked to determine if the subguard insurance covered Broadway Concrete.  They also rejected

the Fraudulent Billing Claim based on the lack of *scienter*.  Pavarini billed the subguard

premium before it entered into a contract with Broadway Concrete, and could not have

knowingly mislead Waterscape about Broadway Concrete's lack of coverage.

It is not clear from the documents provided by the parties whether Waterscape also

asserted the Delay Damage Claim in the State Court Action.  The Delay Damages Claim appears

to state a claim for breach of contract rather than for fraud.  Under New York law, "merely

alleging that the breach of contract duty arose from a lack of due care will not transform a simple

breach of contract into a tort," *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992)

(citations omitted), and a party must "either (i) demonstrate a legal duty separate from the duty to

perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or

extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation

and unrecoverable as contract damages."  *Bridgestone/Firestone, Inc. v. Recovery Credit Servs.,

Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted).

The Delay Damage Claim asserts a breach of duty under the *CM Agreement* to place

Broadway Concrete in default; Pavarini was not under a separate non-contractual duty to do so.

In fact, the claim does not even depend on a misrepresentation or nondisclosure.  Rather, the

allegation explains Pavarini's motive for breaching the *CM Agreement*.  Finally, and subject to

the exclusions in the contract, (*see CM Agreement* at § 7.7), Waterscape could recover its delay

damages arising from that breach.[14]

Assuming that the Delay Damage Claim states a separate fraud claim (as opposed to a claim for breach of the *CM Agreement*), it is nevertheless barred by *res judicata*. New York's transactional approach requires preclusion of all claims "arising out of the same transaction or series of transactions . . . even if based upon different theories or if seeking a different remedy." *Hunter*, 827 N.E.2d at 274 (citation and internal quotation marks omitted). The Delay Damage Claim arises from the same transactions as the Fraudulent Billing Claim and the Fraudulent Concealment Claim: Pavarini's failure to obtain subguard insurance for Broadway Concrete or the concealment of that failure.

In addition, while Pavarini was not a party to the State Court Action, its liability in the present action is vicarious and depends on the culpability of the Principals.[15] *Good Health Dairy Prods. Corp.*, 9 N.E.2d at 759; *accord Marinelli*, 705 N.Y.S.2d at 576. Whether the Principals committed fraud in connection with obtaining subguard insurance was squarely in issue in the State Court Action. The Supreme Court granted summary judgment and the Appellate Division affirmed concluding that there was no evidence of fraud. The granting of a motion for summary judgment is the procedural equivalent of a trial on the merits, *S.J. Capelin Assocs., Inc. v. Globe*

---

[14]    Waterscape cites to *Fireman's Fund Ins. Co. v. Kapralos*, 842 F. Supp. 836 (E.D.N.Y. 1996) in support of its argument that its claim sounds in fraud and not breach of contract. In *Fireman's Fund*, the Court permitted an insurance company to amend its complaint to add a claim for fraud against insureds for allegedly misrepresenting damages caused by a fire. *Id*. at 838-41. In holding that the claim was a fraud claim and not a breach of contract claim, the Court observed that the insurance company's claim was "aimed at recovering what was paid as a result of the fraud, not the greater sum attributable to the contractual breach by [insureds]." *Id*. at 839. In contrast, the Delay Damage Claim seeks damages in excess of $10 million, (*Counterclaim* at ¶ 31), even though fraud claim damages are limited to "out-of-pocket" damages. *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373-74 (N.Y. 1996). Here, Waterscape has failed to indicate any out-of-pocket damages beyond the approximately $200,000 it paid for subguard insurance which was subsequently credited back to Waterscape.

[15]    The state courts did not grant summary judgment based on the absence of evidence that the Principals, as opposed to another Pavarini agent, were responsible for the subguard misrepresentations or non-disclosures.

*Mfg. Corp.*, 313 N.E.2d 776, 777 (N.Y. 1974); *Falk v. Goodman*, 163 N.E.2d 871, 873 (N.Y. 1959), and the judgment dismissing Waterscape's fraud claim against the Principals precludes Waterscape from asserting the identical claim against Pavarini.

Waterscape makes two arguments in opposition: (1) the Appellate Division's decision in the State Court Action was based on the Principals lacking "a special relationship of trust and confidence," and Pavarini is contractually bound by such relationship under the terms of the *CM Agreement*, and (2) the State Court Action was decided with inadequate discovery.  Both contentions lack merit.  First, the Supreme Court and the Appellate Division concluded that even if a duty to speak existed under the "special facts" doctrine, the Principals were entitled to summary judgment on the Fraudulent Concealment Claim because Waterscape had failed to show reasonable or justifiable reliance.  The same defect defeats Waterscape's Fraudulent Concealment Claim against Pavarini, the Principals' employer.

Second, if Waterscape believed that additional discovery was needed to defeat the motion for summary judgment in the State Court Action, it should have made the argument to Justice Braun or to the Appellate Division.   N.Y. C.P.L.R. 3212(f) (McKinney 2015)[16] authorizes the court to allow the party opposing summary judgment to take discovery, but the opposing party "must demonstrate how further discovery might reveal material facts in the movant's exclusive knowledge; [and] mere speculation will be insufficient."  *Scofield v. Trs. of Union Coll.,* 699

---

[16]        C.P.L.R. 3212(f) provides:

>        Should it appear from affidavits submitted in opposition to the motion that facts essential to justify opposition may exist but cannot then be stated, the court may deny the motion or may order a continuance to permit affidavits to be obtained or disclosure to be had and may make such other order as may be just.

N.Y.S.2d 570, 571 (N.Y. App. Div. 1999); *accord Svoboda v. Our Lady of Lourdes Mem'l Hosp., Inc.*, 799 N.Y.S.2d 602, 603 (N.Y. App. Div. 2005); *Pampris v. Egnasher*, 799 N.Y.S.2d 309, 310 (N.Y. App. Div. 2005).  Waterscape cannot collaterally attack the state court judgment in this Court based on its perceived need for discovery in the State Court Action.

### 2.    DRB Action

While the holding in the State Court Action is sufficient to bar the *Counterclaim*, the Court will also briefly address Pavarini's alternative argument that the *Counterclaim* is barred by the resolution in the DRB Action.  The fundamental dispute among the parties is whether resolutions of the DRB constituted binding awards that are subject to the difficult showing a party must make to vacate an arbitrator's award,[17] or were merely temporary resolutions intended to facilitate payment and subject to *de novo* review.  Alternative dispute resolution is a creature of contract, *Westinghouse Elec. Corp. v. New York City Transit Auth.*, 623 N.E.2d 531, 534 (N.Y. 1993) ("Considerable authority thus supports the validity and enforceability of alternative dispute resolution mechanisms, which reflect the informed negotiation and endorsement of parties."), and an alternative dispute resolution clause is subject to the usual rules governing contract interpretation.  *Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 647 N.E.2d 1298, 1302 (N.Y. 1995).  The parties may, by contract, dictate the preclusive effect of an award

---

[17]    Both federal and state law limit the grounds for vacating an arbitration award.  *See* 9 U.S.C. § 10 (vacating arbitration award appropriate "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators, or either of them; (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."); N.Y. C.P.L.R. § 7511(b) (vacating arbitration award appropriate where a party is prejudiced by "(i) corruption, fraud, or misconduct in procuring the award; or (ii) partiality of an arbitrator appointed as a neutral, except where the award was by confession; or (iii) an arbitrator, or agency or person making the award exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made; or (iv) failure to follow the procedure of this article, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection.").

*inter se*, *Am. Ins. Co. v. Messinger*, 371 N.E.2d 798, 803-04 (N.Y. 1977), as well as the rules that

govern judicial review.  *See Westinghouse Elec. Corp.,* 623 N.E.2d at 535 ("[W]e conclude only

that public policy has not been transgressed in this case, particularly because of the provision for

judicial review of the adjudicator's decision.  That review, under the terms of the agreement, is

by CPLR article 78 and thus allows broader review than the usual and stricter standards of

arbitration award review in article 75."); *Yonkers Contracting Co. v. Port Auth. Trans-Hudson*

*Corp.*, 663 N.E.2d 907, 909 (N.Y.) (stating that an ADR provision in a contract between a

private contractor and a public authority that did not provide for the standard of review to be

applied to the Chief Engineer's decision did not render the ADR clause unenforceable as against

New York's public policy concerning the fair adjudication of disputes), *reargument denied*, 668

N.E.2d 420 (N.Y. 1996).

The *CM Agreement* includes several provisions relating to the binding nature and judicial

review of the DRB resolutions.  Section 18.4.3 states:

> The written resolution of the DRB shall be binding upon the
> Parties for the duration of the Project through completion and Final
> Payment.  Upon receipt of a written resolution, the Parties shall
> subsequently act in conformance therewith with reasonable
> promptness. . . .  No earlier than sixty (60) days after completion of
> the Project and issuance of the Final Payment, either Party may
> challenge the results of any DRB resolution through litigation.
> The time for challenging the results of the DRB resolutions is
> meant to be a "cooling off" period subsequent to the completion of
> resolutions by the DRB.

Furthermore, either party may "appeal any resolution of the DRB by initiating litigation" after

the sixty-day period, but the DRB resolution "shall remain binding . . . until contradicted by

entry of judgment by a court of competent jurisdiction. . . ."  (*Id*. at § 18.5.3.)  The "[p]arties may

agree to accept any resolution of the DRB as a final resolution" but if either party "decides not to

24

accept the resolution of the DRB as a final resolution" either may "commence legal proceedings .

. . ." (*Id*. at § 18.7.2.)  If neither party commences legal proceedings within one year after the

Final Payment, "the parties shall be deemed to mutually release each other from any and all

claims which were submitted or could have been submitted for DRB review."  (*Id*.)

Although these provisions contemplate that the DRB resolutions are binding, the

provisions are contradictory, and the *CM Agreement* is silent regarding the scope of judicial

review.  The *CM Agreement* states that the DRB resolutions are binding until the completion of

Final Payment.  This may mean that they cease to be binding thereafter and are subject to *de

novo* review.  Alternatively, this may mean that they are binding until Final Payment simply

because no party can challenge them until after Final Payment and the sixty day cooling off

period, but are then subject to judicial review under the rules governing the review of arbitration

awards.  In addition, the *CM Agreement* states that the DRB resolutions remain binding until

contradicted by the entry of a judgment by a court of competent jurisdiction, indicating that they

are binding even after Final Payment and the filing of an action for judicial review.  Moreover, if

they are not challenged within one year of Final Payment, the DRB resolutions are accorded *res

judicata*-like effect, and preclude any claims that were *or could have been* submitted to the DRB.

The *CM Agreement* is hardly a model of clarity.  Its provisions relating to the binding

nature of the DRB resolutions and the judicial review of those resolutions is ambiguous.  Neither

side has offered any extrinsic evidence that would assist the Court in deriving what they

intended, and the Court cannot, therefore, award summary judgment to Pavarini based on the

matters decided by the DRB.[18]

### D.    Other Defendants' Counterclaim

The Other Defendants filed an identical counterclaim based on fraud with respect to

Pavarini's failure to procure subguard insurance for subcontractor Broadway Concrete.  This

counterclaim fails for several reasons.  To begin with, *Waterscape III* granted Waterscape leave

to amend its answer to file the *Counterclaim*, 520 B.R. at 427, but did not grant the Other

Defendants the same relief.  The Second Circuit has yet to address whether a defendant may

assert a counterclaim as a matter of right in response to an amended complaint.  *Christians of*

*California, Inc. v. Clive Christian Furniture Ltd.*, No. 13 cv 275 (LTS) (JCF), 2014 WL 982889,

at *2 (S.D.N.Y. Mar. 11, 2014).  As one Court in this District put it, "case law addressing this

particular situation, even within this district alone, is all over the map."  *Pereira v. Cogan*, No.

00 cv 619 (RWS), 2002 WL 1822928, at *2-3 (S.D.N.Y. Aug. 7, 2002) (discussing varying

approaches taken by courts when deciding whether to allow defendant to add counterclaim in

response to amended complaint); *see also Uniroyal Chem. Co., Inc. v. Syngenta Crop Prot., Inc.*,

No. 3:02 cv 02253 (AHN), at *2-3 (D. Conn. Mar. 23, 2005) (distinguishing the cases adopting

the permissive, narrow, and moderate views and adopting the moderate view).

Under the "moderate view," which is endorsed by MOORE'S, "when a plaintiff's amended

complaint changes the theory of the case, it would be inequitable to require leave of court before

---

[18]    The Court has been advised that Waterscape commenced one or more actions in New York Supreme Court
challenging DRB resolutions.  (*See* Transcript of May 7, 2015 Hearing at 12:24-14:19, 17:1-21:19.)  At a December
15, 2015 hearing on a different matter, the parties informed the Court that a motion for summary judgment is *sub
judice* in state court.

the defendant could respond with appropriate counterclaims." 3 EDWARD F. SHERMAN & MARY

P. SQUIERS, MOORE'S FEDERAL PRACTICE § 15.17 (3d ed. 2015); *accord Elite Entm't, Inc. v.*

*Khela Bros. Entm't*, 227 F.R.D. 444, 446-47 (E.D. Va. 2005) ("Yet, the moderate, and most

sensible, view is that an amended response may be filed without leave only when the amended

complaint changes the theory or scope of the case, and then, the breadth of the changes in the

amended response must reflect the breadth of the changes in the amended complaint."). Here,

the *Amended Complaint* added a punitive damages claim to Pavarini's existing trust fund

diversion claim. While it pleaded a new theory of recovery, the punitive damages claim did not

change the theory of the case. The Other Defendants' assertion of its fraud counterclaim for

Pavarini's failure to obtain subguard insurance does not respond to the changes made in the

*Amended Complaint*. As a result, the inclusion of that counterclaim was prohibited absent leave

of court.

In any event, the Other Defendants plainly lack standing to assert their fraud

counterclaim. They were not parties to the *CM Agreement* or owners of the Project. Pavarini

had no obligation, contractual or otherwise, to procure subguard insurance for them, it never

billed them for subguard insurance, and they never paid for subguard insurance.

For those reasons, the Other Defendants' fraud counterclaim is dismissed.

### E.    Affirmative Defenses

Pavarini also seeks summary judgment striking the Defendants' second, third, fourth, eleventh, and twelfth affirmative defenses.[19]  The motion is granted for the reasons that follow.

#### 1.    Defendants' Second Affirmative Defense

The Defendants assert that Pavarini's claims in this adversary proceeding have been mooted by the terms of Waterscape's second plan of reorganization under which $11 million was reserved for the benefit of Pavarini and other trust fund claimants.  (*Counterclaim* at 9.)  Under section 7.9 of Waterscape's reorganization plan, Waterscape's debts to Pavarini were not discharged, *Waterscape III*, 520 B.R. at 433, and in fact, the Court granted Pavarini leave to amend its complaint to assert a claim for punitive damages against the Defendants for diverting trust funds.  *Id.* at 436.  Furthermore, the $11 million fund reserved under the plan was intended to pay Class 3 trust fund claims arising under Article 3-A of the New York Lien Law.  The punitive damages claim is not a Class 3 claim.  Instead, it is an unsecured claim that was not discharged.  Accordingly, the Defendants' second affirmative defense is stricken.

#### 2.    Defendants' Third and Fourth Affirmative Defenses

The Defendants' third affirmative defense alleges that Pavarini's claims in this adversary proceeding "are barred by reason of [Pavarini's] own wrongful conduct which has caused damages to [Waterscape] far in excess of the amounts claimed by [Pavarini] in its Complaint."  (*Answer* at 9.)  The third affirmative defense spans five-pages.  (*Answer* at 9-14.)  While it makes numerous allegations, it essentially restates the *Counterclaim*, and its earlier iteration in the

---

[19]    Waterscape's *Answer* mirrors the *Other Defendants' Answer* and includes the same affirmative defenses being challenged by Pavarini.  Unless necessary, this decision does not include separate references to the *Other Defendants' Answer*.

*Original Answer* was the basis for concluding that the *Counterclaim* related back.  It alleges that

Pavarini repeatedly misrepresented the existence of subguard insurance to Waterscape in

payment applications submitted between September 2007 and June 2009, Pavarini failed to place

Broadway Concrete in default, and Pavarini stonewalled Waterscape's efforts to learn of the lack

of subguard insurance.  (*Id*. at 11-12.)  The third affirmative defense also accuses Pavarini of

wrongfully converting $450,000 of imprest funds (working capital for the Project) provided by

Waterscape.  (*Id*. at 12-13.)  Lastly, Waterscape describes the damages it has suffered:

"Pavarini's deficient, incomplete and non-compliant work has resulted in tens of millions of

dollars of damages to Waterscape. . . ."  (*Id*. at 13.)  The Defendants' fourth affirmative defense

states that they are entitled to "setoff and recoupment" on account of "the wrongful acts alleged

in Waterscape's Supreme Court actions against Pavarini and its principals. . . ."  (*Id*. at 14.)

The Defendants' Third and Fourth Affirmative Defenses seek to reduce their liability by

the amount of damages that Pavarini caused, but their defenses sounding in setoff and

recoupment lack merit.

### a.    Setoff

"The right of setoff . . . allows entities that owe each other money to apply their mutual

debts against each other, thereby avoiding the absurdity of making A pay B when B owes A."

*Malinowski v. New York State Dep't of Labor* (*In re Malinowski*)*, 156 F.3d 131, 133 (2d Cir.

1998) (quoting from *Official Comm. of Unsecured Creditors v. Mfrs. and Traders Trust Co.* (*In

re Bennett Funding Grp., Inc.*)*, 146 F.3d 136, 140 (2d Cir.1998)) (internal quotation marks

omitted); *accord Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002).

Although the parties' debts may arise from different transactions, they must be mutual.

*Westinghouse Credit*, 278 F.3d at 149.  "[D]ebts are mutual when they are due to and from the

same persons in the same capacity." *Id.* (quoting *Scherling v. Hellman Elec. Corp.* (*In re Westchester Structures, Inc.*)*,* 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995)).  "[O]bligations lack mutuality where one party is a trust beneficiary asserting his or her rights against a trustee, and the other is a creditor exercising his or her contractual rights."  *Westinghouse Credit*, 278 F.3d at 149; *accord In re Consol. Indem. & Ins. Co.*, 38 N.E.2d 119, 121 (N.Y. 1941) (Mutuality is absent when "[o]ne asserts the right of a cestui que trust against a trustee; the other asserts a contractual obligation of a debtor to his creditor.  The claims are not 'due to and from the same persons in the same capacity.'") (citations omitted); *Ross-Viking Merch. Corp. v. Am. Cyanamid Co., Lederle Div.* (*In re Ross-Viking Merch. Corp.*), 151 B.R. 71, 74 (Bankr. S.D.N.Y. 1993) ("The existence of a fiduciary duty or a trust relationship in one of the capacities of a party involved in an attempted setoff will not satisfy the concept of mutuality.").

Here, mutuality is lacking.  The claims asserted by Pavarini against Waterscape (and Assa) in Count II for punitive damages arise from their breach of trust in diverting trust assets.[20] (*See Amended Complaint* at ¶¶ 66, 71-72 ("The trust funds to which Pavarini and the Class are entitled and which the Waterscape Defendants have unlawfully diverted were received exclusively pursuant to a building loan contract, a building loan mortgage, and/or other trust fund sources.  In accepting and retaining such proceeds, the Waterscape Defendants unlawfully diverted these funds from the statutory beneficiaries.").)  In contrast, Waterscape's (and Assa's) setoff claims sound in breach of the *CM Agreement*, or under the common law, and belong to them, if at all, in their non-trustee capacities.  The Other Defendants' setoff defense fails for an

---

[20]   The principal of the Article 3-A trustee who knowingly participates in the diversion of trust funds is liable along with the trustee for diversion under Article 3-A.  *In re Lehr Constr. Corp.*, No. 11-10723 (SHL), 2015 WL 5174467, at *8 (Bankr. S.D.N.Y. Sept. 2, 2015); *Ippolito v. TJD Dev., LLC,* 920 N.Y.S.2d 108, 118 (N.Y. App. Div. 2011).

additional reason that they are not in contractual privity with Pavarini, and have not identified

any duty that Pavarini owed or breached.

### b.    Recoupment

Recoupment rights are determined pursuant to nonbankruptcy law. *New York State Elec.*

*& Gas Corp. v. McMahon* (*In re McMahon*), 129 F.3d 93, 96 (2d Cir. 1997). Under New York

law,

> [r]ecoupment means a deduction from a money claim through a
> process whereby cross demands arising out of the same transaction
> are allowed to compensate one another and the balance only to be
> recovered. Of course, such a process does not allow one
> transaction to be offset against another, but only permits a
> transaction which is made the subject of suit by a plaintiff to be
> examined in all its aspects, and judgment to be rendered that does
> justice in view of the one transaction as a whole.

*Id.* (quoting *Nat'l Cash Register Co. v. Joseph*, 86 N.E.2d 561, 562 (N.Y. 1949)); *accord*

*Westinghouse Credit Corp.*, 278 F.3d at 146. Unlike a setoff, recoupment must arise from the

same transactions as the plaintiff's claim; unlike a counterclaim but like setoff, recoupment

reduces the defendant's liability but does not permit affirmative recovery. *Constantino v. State*

*of New York*, 415 N.Y.S.2d 966, 969 (N.Y. Ct. Cl. 1979).

The Defendants' recoupment defense fails for a number of reasons. The recoupment

claims that form the basis of the third and fourth affirmative defenses do not arise from the

"same transaction" as Pavarini's claims. Pavarini's claim for diversion arises under Article 3-A

of the New York Lien Law. The third and fourth affirmative defenses seek to reduce

Waterscape's liability based on claims arising under the *CM Agreement* or tort law.

Consequently, the two debts do not arise from a "single integrated transaction" required under

the recoupment doctrine. *Westinghouse Credit Corp.*, 278 F.3d at 147 (citation and internal

quotation marks omitted).  In addition, the Other Defendants lack a recoupment defense for the

same reason they lack a setoff defense – they have no claim against Pavarini to reduce their

liability.

For these reasons, Defendants' recoupment defense is stricken.

### 3.    Defendants' Eleventh Affirmative Defense

Defendants' eleventh affirmative defense alleges that the action should be dismissed

based on Pavarini's failure to join necessary parties.  Federal Civil Rule 19, made applicable to

this adversary proceeding by Federal Bankruptcy Rule 7019, governs the required joinder of

parties.[21]  It establishes a three-part test to determine whether a party's joinder is required: "(1) is

---

[21]    Rule 19 provides:

**(a) PERSONS REQUIRED TO BE JOINED IF FEASIBLE.**

(1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

....

**(b) WHEN JOINDER IS NOT FEASIBLE.** If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:

(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

(2) the extent to which any prejudice could be lessened or avoided by:

(A) protective provisions in the judgment;

(B) shaping the relief; or

(C) other measures;

(3) whether a judgment rendered in the person's absence would be adequate; and

the absent party a 'necessary' party, (2) is the absent party's joinder 'feasible,' and (3) if joinder

is not feasible, should the court, in 'equity and good conscience,' dismiss the action because the

nonparty is 'indispensable' under Rule 19(b)?"  *Official Comm. of Unsecured Creditors v. JP*

*Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 394 B.R. 721, 744 (Bankr.

S.D.N.Y. 2008) (citation omitted).

The Defendants fail to identify the unjoined necessary parties or explain why this

adversary proceeding cannot proceed without them.  As a result, their eleventh affirmative

defense is stricken.

### 4.    Defendants' Twelfth Affirmative Defense

The Defendants' twelfth affirmative defense alleges that Pavarini willfully exaggerated

its liens.   The defense appears to be based on N.Y. Lien Law §§ 39 and 39-a.  Section 39

provides that if the court concludes in any action to enforce a mechanic's lien that the lienor has

willfully exaggerated his lien, "his lien shall be declared to be void and no recovery shall be had

thereon."[22]  Section 39-a states that the person who filed the void lien will be liable in damages

to the owner or contractor.[23]  The Court previously denied Waterscape's request for leave to

---

(4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

[22]    Section 39 states:

In any action or proceeding to enforce a mechanic's lien upon a private or public improvement or in which the validity of the lien is an issue, if the court shall find that a lienor has wilfully exaggerated the amount for which he claims a lien as stated in his notice of lien, his lien shall be declared to be void and no recovery shall be had thereon. No such lienor shall have a right to file any other or further lien for the same claim. A second or subsequent lien filed in contravention of this section may be vacated upon application to the court on two days' notice.

[23]    Section 39-a states:

Where in any action or proceeding to enforce a mechanic's lien upon a private or public improvement the court shall have declared said lien to be void on account of wilful exaggeration the person filing such notice of lien shall be liable in damages to the owner or contractor. The

assert a counterclaim under §39 on the ground that it was futile; this adversary proceeding did not concern an effort by Pavarini to enforce a mechanic's lien which was discharged under Waterscape's plan.  *Waterscape III*, 520 B.R. at 437; *see Gorton v. George A. Nole & Sons, Inc.* (*In re Mohawk Frozen Foods, Inc.*), 780 F.2d 7, 9 (2d Cir. 1985) ("[D]amages under section 39-a may not be imposed when a mechanic's lien has been discharged for reasons other than 'wilful exaggeration.'").

The affirmative defense is similarly futile.  Willful exaggeration, whether asserted as a counterclaim or an affirmative defense, may only be interposed in an action to foreclose a mechanic's lien.  *Mel-Stu Constr. Corp. v. Melwood Constr. Corp.*, 475 N.Y.S.2d 459, 461 (N.Y. App. Div. 1984).  Moreover, the Other Defendants have failed to identify any of their own property against which Pavarini filed a mechanic's lien.  They are neither owners nor contractors with respect to the Project, and are not entitled to damages under § 39-a of the New York Lien Law.  Accordingly, the twelfth affirmative defense is stricken.

---

damages which said owner or contractor shall be entitled to recover, shall include the amount of any premium for a bond given to obtain the discharge of the lien or the interest on any money deposited for the purpose of discharging the lien, reasonable attorney's fees for services in securing the discharge of the lien, and an amount equal to the difference by which the amount claimed to be due or to become due as stated in the notice of lien exceeded the amount actually due or to become due thereon.

**CONCLUSION**

For the reasons stated, Pavarini's summary judgment is granted as set forth herein.  The

parties are directed to schedule a conference with the Court to schedule a trial.  Settle order on

notice.


Dated: New York, New York
       January 14, 2016


                    /s/ *Stuart M. Bernstein*
                    STUART M. BERNSTEIN
            United States Bankruptcy Judge